305 P.2d 495

STATE of Utah, by and through its ROAD COMMISSION; H. J. Corleissen, Chairman, Layton Maxfield and Lorenzo J. Bott, members of the State Road Commission, Plaintiff and Appellant,

v.

Brack Howard NOBLE and Ann C. Noble, his wife; Elmo England; E. J. Huber, and Pacific National Life Assurance Company, a corporation, Defendants and Respondents.

No. 8544.

Supreme Court of Utah.

Jan. 10, 1957.

Public Schools, 121 Utah 503, 243 P.2d 941.

E. R. Callister, Atty. Gen., Walter L. Budge, K. Roger Bean, Robert B. Porter, Asst. Attys. Gen., for appellant.

Herbert B. Maw, Salt Lake City, George K. Fadel, Bountiful, for respondents.

42

WORTHEN, Justice.

Appeal from a judgment upon a verdict of a jury awarding defendants $150,000. Interest in the sum of $7,321.05, being interest on said $150,000 from date of occupancy by plaintiff at 8% per annum, was added.

The State of Utah through its State Road Commission brought this action to condemn approximately 8.1 acres of land belonging to defendants in Salt Lake and Davis Counties for highway purposes. The only question for determination is this: Does the evidence support the jury's verdict?

The evidence reveals that the property in question located between U. S. Highway 91 and the Wasatch Mountains was being used by defendants for several purposes.

Defendant Brack Howard Noble testified that he purchased the land about 8½ years before the condemnation action was commenced and that he occupied it continuously until the state took possession on July 22, 1955. He testified that on the property was his residence, an antique business, a trailer court business and a sand and gravel business. He testified that none of these uses was incompatible with any other.

Mr. Richards, a civil engineer, a witness for defendants, testified that he was requested by defendants to determine the quantity and quality of the materials found on the property; that he employed a driller and supervised the drilling operations; that he concluded there were 1,299,868 tons of material in the tract, of which 355,222 tons was "muck" sand and 944,646 tons was mixed sand and gravel.

Mr. Richards did not testify as to the value of the sand and gravel, nor of the land or any business or improvements thereon.

Defendant's witnesses placed the fair market value of the property at $270,000, $270,768 and between $250,000 and $275,-000, while the defendant placed a total value on the property of $300,000. Defendant testified that he placed a value of $200,000 on the sand and gravel on the property.

It is apparent from reading the testimony of defendant and his three witnesses who testified as to the value of the property that they and each of them based their valuation on the aggregate total of values placed on the premises in part by other experts who each appraised a segment of the property and/or its operations.

All witnesses included as a factor in computing the value of the property the quantity of sand and gravel testified to by Mr. Richards. No single witness testified as to the value of the property based upon his own knowledge and experience. All used Richards' estimate of the quantity of sand and gravel; some used the testimony of other witnesses as to the value of sand and gravel per ton.

A reading of the testimony of defendant's experts shows with abundant clearness that they arrived at their determination of the

value of the lands in question by multiplying the estimate of another expert (Engineer Richards) as to the tons of sand and gravel in place by the estimated value per ton.

■ Fixing the value of land in condemnation cases by finding the product of the number of tons of muck sand and sand and gravel in place multiplied by the price per ton is almost universally condemned.

Our Constitution[1] forbids the taking of private property for public use without just compensation. To just compensation and to that only are the defendants entitled.

■ Just compensation means that the owners must be put in as good a position money wise as they would have occupied had their property not been taken. In United States v. Miller,[2] the court said:

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value', the 'market value', and the 'fair market value' of what is taken."

The problems in this type of case are pointed up by observing part of the testimony of defendant Brack Howard Noble. He testified that the value of the muck sand and the sand and gravel on the premises was $200,000.

"Q. You heard the testimony yesterday, did you not, that there were 355,000 tons of muck sand in place on your ground, 355,000 tons? A. Yes."

When asked how long it would take to sell the muck sand defendant answered:

" * * * The way the market is going, I imagine I should be able to sell the muck sand in 15 years."

When asked how he arrived at the figure of $200,000 for the value of the sand and gravel on the property defendant answered:

"A. 25¢ a ton for sand and about 15¢ a ton is what I thought sand and gravel is worth."

This court in State v. Tedesco[3] observed:

"A condemnee is not entitled to realize a profit on his property. It must go to the condemnor for its fair market value, as is, irrespective of any claimed value based on an aggregate of values of individual lots in a subdivision which *one hopes to sell at a future time to individuals* rather than to an individual.

1. Article I, Section 22.
2. 1943, 317 U.S. 369, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55.
3. 4 Utah 2d 248, 291 P.2d 1028, 1029.

44

The test is not what the lots will bring when and if 62 willing buyers come along, but *what the tract, as a unit,* and as is, platted or not, and in whatever state of completion, will bring from a willing buyer of the whole tract." (Emphasis added.)

■ As heretofore observed all of the expert witnesses who testified for defendants fixed the value of the land by finding the product of the total tons of sand and gravel times the price per ton. Such is not the proper method of fixing the fair market value of the property. Courts have with great unanimity rejected the proposition that just compensation is the equivalent of the total profits which would be realized from the future operations of the property. The measure of damages is (said to be) the market value of the property and not the output thereof. The accepted formula for determining fair market value is not how much would the property produce over a period of fifteen years, but what would a purchaser willing to buy but not required to do so, pay and what would a seller willing to sell but not required to do so, ask.

■ As will be observed from the cases hereafter considered, the defendants are not entitled to the value of the sand and gravel independently of the land of which it is part, nor considered as merchandise. The land must be valued as land with the sand and gravel given due consideration

as a component part of the land, and evidence of the amount, quality and value of the sand and gravel may be considered.

In Nichols on Eminent Domain, Volume 4, p. 245, title Mineral Deposits, the author says:

" * * * All legitimate evidence tending to establish the value of the land with the minerals in it is permissible. This is not to say that such minerals are to be separately evaluated but that consideration may be given to the quantity of the mineral that can be extracted and to the value thereof purely as evidence for arriving at the value of the land."

The same author under the same Section and on page 248 observes:

"In applying the valuation process to mineral deposits in place it has been held improper to determine the value thereof by using the product of the estimated amount of the deposit and a fixed price per unit. In the first place the estimate of the quantity has been considered too speculative and uncertain to merit consideration. In view of of the contingencies and uncertainties of business in general, there can, in such case, be no certain estimate of the cost and potential profits. Undoubtedly, proof as to the quantity and quality of a mineral deposit is important as is also the cost of extracting it and processing

it for the market. However, these are elements only to be considered with others in determining the value of the property. * * *"

Orgel on Valuation under Eminent Domain (4th Ed.) pp. 541–547, Section 164, under title "The Quarry and Mining Cases" says:

"The courts have *generally rejected these attempts to introduce into evidence the various, forms of earnings and profits data.* They have usually stated that the *measure of compensation* in the *quarry cases, as in other eminent domain cases,* is the market value of the land, but that the stone deposits may be considered as bearing on the market value of the land. Accordingly, it is proper to admit evidence that the land contains valuable mineral deposits, but the award may not be reached by separately evaluating the land and the deposits.

"Evidence of realized profits derived from quarry operation receives the same treatment as general business profits, and similar reasons are advanced for the exclusion of the testimony. In City of Los Angeles v. Deacon [119 Cal.App. 491, 7 P.2d 378], the sub-lessee of the quarry was permitted, on direct examination, 'to make a statement of his net profit at the plant during the year 1928, after pay-ing rent to his lessor and rent to the owner.' In holding this evidence inadmissible, the court said:

" 'To accept a statement of net profits as a fact to be taken into consideration in arriving at market value, of necessity opens the door to an investigation into the accounting system of those operating the plant; into the costs of installation and replacements; raises questions of efficiency and skill; and leads into innumerable other side roads and alleys. A witness who has given an opinion as to market value may be asked on cross-examination if he knew of the net profit, and what importance, if any, he attached to it; but such questions are permitted to test the value of the opinion ventured, and not because the sum involved is to be made use of by the court or jury as a basis for computing market value.' "

"A fortiori, *it is error to consider testimony based on assumptions as to annual productivity over a long period of years, fixed future costs of production and sale prices of the quarry product.* * * *"

"But more often the owner contends that the proper way to arrive at the market value of the property *is to estimate the amount of stone in situ* and to multiply this amount by a fixed price per unit. This method is uniformly

rejected. The leading case is an early Pennsylvania decision, Searle v. Lackawanna & B. R. Co., (33 Pa. 57) where the court in affirming the exclusion of such evidence said:

" 'Moreover, the offer impliedly requires a degree of refinement in the measure of values, which seems to us totally incompatible with the gross estimates of common life. Though we might have the most accurate calculation of the quantity of coal in the land, yet, without knowing exactly the expense of bringing it to the surface and carrying it to market, and the amount likely to be lost in mining and conveying, and the times in which it would be brought out, and the market prices at those times, the quantity would not help us to value the land. The gross estimates of common life are all that courts and juries have skill enough to use as a measure of value. All other measures are necessarily arbitrary and fanciful.' "

" * * * Earlier in the opinion the court had pointed out the essential speculativeness of estimates of the amount of stone in remarking that 'to use the products as a standard of value of the land, is to apply an uncertain measure in order to obtain a certain result. It is easier to value the land directly than thus.' " (Emphasis added.)

In the early case of Orleans County Quarry Co. v. State [4] the state appropriated three quarry properties belonging to the company. The Board of Claims valued the 7.301 acres of land appropriated at $76,327.54. The valuation was arrived at by figuring the probable amount of stone in the ground and giving that value to claimant. The New York Court set aside the award and ordered a new trial. The court remarked:

"Undoubtedly the proof as to the quantity and quality of the stone was important, and the cost of getting it out ready for market; but these are elements only to be considered with others in determining the value of the property. *There is no limit to the value of a quarry or sand bank* or clay bank, if an estimate can be made of *the amount of stone,* sand, or clay which can be taken, and a fixed price put upon it. Such computation ignores to quite an extent the loss and contingencies of the business. The Board should properly take into consideration the nature of the property, that it is in a locality where there are valuable quarries, and that there are quarries upon it, and that it has a value greater than farming lands, and should

4. 1916, 172 App.Div. 863, 173 App.Div. 990, 159 N.Y.S. 30, 31.

give consideration to the evidence as to the quality and quantity of the stone which may be quarried; but the fact remains that there are many quarry lands in the locality, and such lands have only been sold by the acre, *and if all the quarry land in Orleans county can be sold by fixing the value of the stone in situ, the wealth of the county is* beyond reasonable estimation. The Board did not pay attention enough to other circumstances bearing directly upon the value of this property, and gave too much attention to the expert evidence and the estimates of the profits derived from the quarry business. The award is clearly excessive." (Emphasis added.)

In the Iowa case of Nedrow v. Michigan-Wisconsin Pipe Line Co.[5] the pipeline company brought condemnation proceedings to acquire a right of way. The District Court gave judgment in favor of plaintiff for $101,440. The property taken over for the pipeline was under lease by plaintiff which provided for payment of a royalty of 5¢ per ton of limestone quarried from the land. The court found that by reason of the pipeline it would be impossible to remove the limestone from approximately 6.9 acres of ground. The court further found that there was no evidence of market value because there was no proof of sales of like property producing similar rentals or royalties.

The court then computed the amount of limestone which would necessarily be left unquarried by reason of the pipeline at 3,248,700 tons and found that the royalty due plaintiffs was $162,435.

The trial court then made the following finding:

" 'But this is not the measure of the damages, since this sum would be payable at the rate of $4,000.00 per year consequently it would not all be paid until 41 plus years elapse from the commencement of the removal of the stone. It is further shown that the operation on the areas computed would not commence for a period of from three to five years, it would mean that payments would not be completed for 46 plus years. The payments would commence in five years and continue for a period of 41 years. The present worth of this sum is the measure of plaintiff's loss by reason of being prevented by the pipeline from removing the stone in the areas above set out.' "

The trial court then fixed plaintiff's damages as the present worth of $162,435, payable $4,000 a year for 41 years beginning five years from date, fixing the value of the Use of the money at 2½ per cent per annum and arrived at a figure of $100,000 and then held.

5. 245 Iowa 763, 61 N.W.2d 687, 691.

" 'Assuming the correctness of the computation the amount of plaintiffs' damage is $1,440.00 damage to the surface plus $100,000.00 or a total of $101,440.00.' "

On appeal the Supreme Court of Iowa reversed the case and held that it was error to award the value of the mineral deposits in the land as the measure of damages for the property taken, since evidence of mineral deposits is only a permissible consideration not a yardstick with which to measure damages.

The Iowa court quoted approvingly from an annotation in 156 A.L.R. 1416 as follows:

" 'With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land.' "

The court quoted further from 156 A.L.R. p. 1423:

" 'It is a general rule that in ascertaining the amount of compensation to be awarded for taking property containing mineral deposits in eminent domain, *the amount of the mineral* deposits *cannot* be estimated and then be multiplied by a fixed price per unit. The reason for this rule is said to be that the estimate as to the quantity and quality of the minerals in the land constitutes mere speculation and that, furthermore, even if such amount could be exactly ascertained, the costs of mining and the profits made therefrom would still be uncertain, since the contingencies of the business could not be estimated with any fair degree of certainty.' " (Emphasis added.)

The Iowa court further observed:
" * * * Without holding the record justifies *resort to intrinsic value* we hold that *value cannot* be established by finding the amount of rock in place and measuring the recovery by the amount rendered unquarriable by the taking, multiplied by the royalty figure." (Emphasis added.)

In Reiter v. State Highway Commission[6] eminent domain proceedings were instituted by the Commission. The Commission appealed contending that the trial court erred in permitting witnesses for the landowners to testify as to the value of the condemned land predicated solely on the bases of the value of sand deposits lying beneath the land. The Kansas Court observed:

6. 177 Kan. 683, 281 P.2d 1080, 1083.

"In the instant case, the landowners contend the testimony was admissible as it had a direct bearing on the market value of the land. It is true that the sand deposits had a bearing on the market value of the land. *The question for determination was the value of the land, not the value of the sand beneath the surface.* It was proper to show the quantity and quality of the sand, and these elements could be considered in arriving at the value of the land as a whole. However, it was not proper to arrive at a value of the land being condemned by taking such quantity of sand and multiplying it either by a royalty rate per yard, or by multiplying such quantity by a price sand was currently bringing per yard. While it was shown by testimony of witnesses the ease of mining the sand, and that there was no sand of such quality and quantity located in the same county, it was not shown there was a ready market for such sand. *Whether the sand would ever be mined and marketed was mere speculation.* However, even were we to assume a ready market for the sand, it must be remembered that in condemnation proceedings, the question [for] determination is the value of the land as a whole, and valuations *based upon some particular material contained within the land are not competent evidence of the value of the land as a whole.* While it is true the owner of land taken by eminent domain proceedings is entitled to compensation for that of which he is being deprived, and to award less is unjust, it is equally unjust to cause the public to bear the cost based upon conjecture and speculation."

In United States ex rel. Tennessee Valley Authority v. Indian Creek Marble Co.,[7] the court used this language:

"Fixing just compensation for land taken by multiplying the number of *cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts.* This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the *existence,* but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible *competition of better materials of the same general description and of*

7. D.C., 40 F.Supp. 811, 822.

*the possible substitution* of other and more desirable materials produced or possible of production by man's ingenuity, *even to the extent of rendering* the involved material unmarketable. * * * It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value. True it is that *quality* and *quantity* have a place in the mind of the buyer and the seller, *but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent. Values fixed by witnesses on such a basis are practically worthless, and should not be accepted."* (Emphasis added.)

In State v. Tedesco, supra, this court quoted approvingly the following language of the Pennsylvania Court: [8]

" 'The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor, in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in.' " [4 Utah 2d 248, 291 P.2d 1030.]

■ It is abundantly clear from a reading of the testimony of the witness for both the respondent and the State that all arrived at their valuation of the real estate by fixing the value of the sand and gravel through the formula of tons in place times price per ton. It is true that the witnesses for respondent and the State were far apart on their estimate of removable sand and gravel but it is apparent that both parties relied upon an erroneous conception and an improper formula in determining the value of the land. As a result of using the appraised value of the sand and gravel in arriving at the value of the land there was no competent evidence to support the verdict.

■ The test of market value is not an expert's estimate of what a buyer would pay per ton for sand and gravel multiplied by the total tons of each over a period of

8. Pennsylvania S. V. R. Co. v. Cleary, 125 Pa. 442, 17 A. 468.

many years after the same has been removed from the land.

It is inconceivable that a willing buyer who was not required to purchase would pay for the land in question a price in cash that would require many years in disposing of the sand and gravel to recover back the full estimated purchase price if it were recoverable at all.

Such a purchaser would take into consideration the possibility of higher taxes—higher labor costs—possibility of curtailed market as well as the possibility that like the livery stable, the bicycle shop, the buggy and surrey manufacturing plant and the steam locomotive manufacturing plant, there might well be a complete cessation of any demand for the products under consideration.

It is manifest that all estimates of value were arrived at by using as part of the value of the real estate the product of the total tons of sand and gravel times the price per ton of each which is improper for which reason there is absent evidence to sustain the verdict. Judgment reversed and the case remanded for a new trial. No costs awarded.

CROCKETT, WADE and HENRIOD, JJ., concur.

McDONOUGH, C. J., concurs in the result.