335 P.2d 831

STATE of Utah, by and through its ROAD COMMISSION, H. J. Corleissen, Chairman, Layton Maxfield and Lorenzo J. Bott, members of the State Road Commission, Plaintiff and Appellant,

v.

Brack Howard NOBLE and Ann C. Noble, his wife, Elmo England, E. J. Huber, and Pacific National Life Assurance Company, a corporation, Defendants and Respondents.

No. 8884.

Supreme Court of Utah.

March 2, 1959.

E. R. Callister, Jr., Atty. Gen., Walter L. Budge, Deputy Atty. Gen., Wallace B. Kelly, Asst. Atty. Gen., for appellant.

Herbert B. Maw, Salt Lake City, George K. Fadel, Wendell B. Hammond, Bountiful, for respondent.

WADE, Justice.

The State brings this appeal from a judgment in a condemnation case awarding Mr. and Mrs. Noble $175,000. In a former appeal we reversed an award of $150,000 because it was not supported by substantial evidence and remanded the case for a new trial.[1] For a more detailed statement of the facts and our holdings on that appeal see the former opinion.

On the retrial the jury returned a verdict for $25,000 more than the previous verdict. On the State's petition the trial court ordered a new trial unless the defendants offered to remit $35,000 from such judgment and further ruled that if the State refused to accept defendants' offer to remit, the motion for a new trial was denied. The defendants offered to make the required remittance, but the State refused to accept and brings this appeal, again contending that the judgment is not supported by the evidence.

Is the defendants' evidence sufficient to support the jury's award, is the question confronting us. The suit was brought to condemn 8.1 acres of land at the boundary line between Salt Lake and Davis Counties north of Salt Lake City. When the State was awarded possession on July 22, 1955, 595 feet fronted on the east side of U. S. Highway 91. The tract is also 595 feet deep from the east boundary line of the

1. State By and Through Road Commission v. Noble, 6 Utah 2d 40, 305 P.2d 495, 498.

highway and runs easterly up the mountain side. Fronting on the highway was a brick dwelling, an office building and antique shop, a garage, a building housing washrooms and restrooms for occupants of the trailer park and 32 auto-trailer spaces, all of which were provided with water and sewer facilities. This land was on a side hill between the mountain to the east and the highway to the west, with a steep slope up toward the mountain on the eastern side. It was covered with deep layers of sand and gravel with all of the topsoil east of the improvements removed. The defendants' evidence based on engineers' estimates from drillings on the land indicated there were approximately 355,222 tons of fine sand and approximately 944,646 tons of a mixture of gravel on the property available for sale, making a total of 1,299,868 tons of sand and gravel.

By our previous decision we reversed the jury verdict holding it was not supported by the evidence. In so doing we said:

"As heretofore observed all of the expert witnesses who testified for defendants fixed the value of the land by finding the product of the total tons of sand and gravel times the price per ton. Such is not the proper method of fixing the fair market value of the property. Courts have with great unanimity rejected the proposition that just compensation is the equivalent of the total profits which would be realized from the future operations of the property. The measure of damages is (said to be) the market value of the property and not the output thereof. The accepted formula for determining fair market value is not how much would the property produce over a period of fifteen years, but what would a purchaser willing to buy but not required to do so, pay and what would a seller willing to sell but not required to do so, ask.

"As will be observed from the cases hereafter considered, the defendants are not entitled to the value of the sand and gravel independently of the land of which it is part, nor considered as merchandise. The land must be valued as land with the sand and gravel given due consideration as a component part of the land, and evidence of the amount, quality and value of the sand and gravel may be considered."

Contrary to the State's contentions, the defendants' witnesses did not fix the value of the property at the net price per ton of the sand and gravel multiplied by the number of tons available for sale on the property. The State relies on the testimony of defendant Mr. Noble in making such contention. Noble, after describing the condition of the property and the improvements thereon, gave his opinion that $300,-000 was its market value at the time of

taking. He only mentioned the items by which he arrived at this value when the State recalled him and pressed him to disclose how he arrived at the value he fixed. Then he testified that he figured the replacement cost of the buildings and improvements at $44,000. less $4,000 depreciation. He figured the 595 feet fronting on the highway at $100 per front foot or $59,000. He figured 355,222 tons• of sand would sell for a net total profit of $213,133.-20 and 944,646 tons of gravel would sell for a net total profit of $377,858.40, and totaled all of these items at $690,491.60. He gave his opinion that all the sand and gravel could have been sold at such rate within three years after the State took possession. He explained his estimate of 15 years to make the sale in the previous trial as a device to spread the income over a longer period for income tax purposes.

He explained that property with sand and gravel, frontage and improvements worth more than $690,000 surely would sell for a lump sum on the open market of $300,000, or less than half of the total value of the various items which he considered. This does not fix the market price at the amount the sand and gravel could be sold for over a period of years, but fixes it.at less than half of all the items which he considered. Obviously it is an attempt to take into consideration these various items which contribute to the value of the property and to conclude therefrom what a willing buyer who was not required to buy would pay to a willing seller who was under no compulsion to sell on the open market. This shows that his opinion was based on due consideration of the frontage on the highway, the improvements on the land and the deposits of sand and gravel, and that the evidence supports the verdict.

 In our former decision we found two related defects in the evidence from which we concluded that the verdict was not supported by competent evidence. (1) We held that fair market value of condemned property should not be determined on the basis of piecemeal future sales, but on what the property could be sold for as a unit to a willing buyer by a willing seller without compulsion. (2) We held that the fair market value cannot be projected by multiplying the estimated tons of sand and gravel on the property by the estimated net price per ton which might be realized by future sales.

On the other hand, we indicated that the quantity and quality of sand and gravel on the property, together with the probable net profits therefrom by future sales, were admissible in evidence and could be considered by the jury and by experts in arriving at the fair market value of the property. The authorities definitely so hold: In 4 Nichols on Eminent Domain 243–245 it is said:

"* * * The rule is widely prevalent in this country that *the existence of mineral deposits in or on land is an element to be considered in determining the market value of such land.* Also as in the case of vegetable growths, the rule has been correlatively stated that *the value of such mineral deposits cannot be separately determined independently of the land* of which it is a part. It cannot be *considered as so much potential merchandise* to be evaluated as such. *The land taken must be valued as land with the factor of mineral deposits given due consideration.* In determining the just compensation to be paid to the owner it is not permissible *to aggregate the value of the land and the value of the deposit.* Thus, the value of the land as stone land suitable for quarrying—but not the value of the stone separate from the land—is a proper subject of consideration both by the witnesses and the jury in fixing the amount of just compensation to be awarded. The value of the land is not measured by such facts. The stone is a component part of the land. However, while the profits, price or value of the minerals, taken separately, may not be considered, yet the value, extent and quality of such minerals as exist upon the land may be considered. *If the extent and quality and value of the stone as it lies on the land may not be considered, there would be no way by which the value of the land with the minerals could be shown.* All legitimate evidence tending to establish the value of the land with the minerals in it is permissible. This is not to say that such minerals are to be separately evaluated *but that consideration may be given to the quantity of the mineral that can be extracted and to the value thereof purely as evidence for arriving at the value of the land.* If a piece of land contains valuable improvements, those improvements apart from the land may not be considered. But certainly the character, nature and extent of the improvements and the revenue derived therefrom are as essential to be considered in arriving at the value of the land as the land itself or the uses to which it may be put." (Emphasis ours.)

Also in 156 A.L.R. 1416–1417 a note on this question says:

"With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land.

The reason for this rule is that the measure of compensation in eminent domain proceedings is the market value of the land to be condemned as a whole with due consideration of all the components that make for its value. This rule has been expressed in a great number of decisions and has also been recognized by all the leading textwriters on this subject. It has been applied indiscriminately to all forms of mineral deposits, such as limestone, ore, gold, fire clay, coal, sand and gravel, and stone."

■ The State does not claim that evidence of the quantity, quality and value of this sand and gravel was inadmissible but claims that the evidence shows that the opinions of defendants' experts were based on the total tons of sand and gravel times the expected net profit per ton in future sales, and that according to our former decision such opinions do not support the verdict. There is a difference between fixing the value of the land by estimating the net profits which may be derived from future sales of sand and gravel from the property, and arriving at an opinion of the fair market value of the property as land at the time of the taking by giving due consideration to the value of the sand and gravel deposits thereon with other elements which make up the total value of the property. If the extent, quality and value of sand and gravel on the property may not be so considered there would be no way by which the value of the land with such deposits could be shown. Clearly it was proper for the jury and the expert witnesses to consider these elements in determining the value of the land just the same as it was proper for them to so consider the buildings and improvements on the land in arriving at the fair market value of the property.

■ The record does not show that any of defendants' witnesses valued this land or any part thereof at the total net profits which might be realized from future sales of sand and gravel deposits thereon. As previously pointed out, defendant Noble, on whose testimony the State relies to support its contention, estimated the total net value of three items at more than $690,000 as the basis for his opinion that the tract as a whole had a fair market value of $300,000. Thus his valuation of the tract was less than half of the value he claimed for the total of the separate items and the jury's award was slightly more than a fourth of such total. We find nothing improper in the opinion of defendants' experts. The trial court indicated it considered the verdict excessive by its order of a new trial unless defendants remitted $35,000. The defendants agreed to such remittance. The evidence amply supports, after remittance, a judgment of $140,000 with interest and costs.

Case remanded with directions to enter judgment accordingly. Costs to defendants.

CROCKETT, C. J., and WORTHEN and McDONOUGH, JJ., concur.

HENRIOD, Justice (dissenting).

I dissent, believing that this case is not materially different than the one we decided about a year ago[1] where we reversed a jury verdict for $150,000. I think the language of Mr. Justice Worthen in that case is equally applicable here, when he said that:

> "It is apparent from reading the testimony of defendant and his three witnesses who testified as to the value of the property that they and each of them based their valuation on the aggregate total of values placed on the premises in part by other experts who each appraised a segment of the property and/or its operations,"

and that

> "A reading of the testimony of defendants' experts shows with abundant clearness that they arrived at their determination of the value of the lands * * * by multiplying the estimate of another expert (Engineer Richards) as to the tons of sand and gravel in place by the estimated value per ton."

So far as I can detect, the main opinion here recites and the record reflects no new, different and controlling material facts not found in our first opinion or not germane thereto. Engineer Richards' testimony was identical in both trials, having been read into the record in the second trial. Defendant and all of his experts at the second trial, all of whom testified at the first trial except one, also used Richards' estimate and data in their computations. Defendant Noble testified for the second time that in his opinion the property was worth $300,000, and the three experts who testified at the first trial gave the same or almost identical figures at the second trial, the amounts testified to at the first being $270,000, $270,768 and a figure between $250,000–275,000. At the second trial the figures were from $270,000–275,000, $275,000 and from $260,000–270,000, with the fourth expert estimating the value at $291,000. All four used Richards' data as mentioned, a circumstance that this court specifically leaned on to conclude that the witnesses had arrived at their figures by multiplying Richards' tonnages by the sales price per ton at time of condemnation, less expenses. The almost identical average of estimates of defendants' experts at the first trial, $269,-

1. State By and Through Road Commission v. Noble, 1958, 6 Utah 2d 40, 305 P.2d 495, 497.

423 and at the second trial, $270,833, hardly seems likely to have been arrived at except by using the same system of calculation, and there is nothing in the main opinion or in the record of the second trial indicating that the experts arrived at their estimates in any other manner. Their consistency does not seem to be shared by us in our diametrically opposed decisions. It seems to me that either we were wrong in the first case or are wrong in the instant case.

A casual reading of the record shows that the defendants went to great lengths in parading quantity of material and tonnage sales price before the jury, with the implication that the fair market value of the property was made up at least partly by future profits which the owner would lose by condemnation,—a factor which we have said is not includable within the term fair market value.[2] The most substantial portion of defendants' case in chief was devoted thereto, as was counsel's argument to the jury. Nowhere was it shown that any willing buyer would have paid Noble anywhere near $300,000, his figure, or $175,000, the figure of the jury, which the trial court thought to be $35,000 in excess of what a willing buyer would pay. It is also interesting to note that the defendant became a willing seller of the property at the $140,000 to which the court reduced the verdict.

The main opinion suggests that the plaintiff on cross-examination relied on the testimony of Noble, which was substantially the same in the first trial, to establish its contention. I cannot subscribe to that suggestion, and this court made no suggestion in the first trial. From the record it would appear that the cross-examination was an attempt to impeach and discredit the somewhat fabulous claim of Noble that the property had a $300,000 fair market value, which turned out to be a figure that the jury was not willing to buy in excess of $175,000, and which the trial court was not willing to buy in excess of $140,000, justifying such impeachment and discrediting of his inflated opinion. I am of the opinion from reading the cross-examination that Noble did use the multiplication table in arriving at his figure, and there is no magic or binding force to his rather nebulous testimony at the first trial that he could have sold the gravel for about $700,-000 within 15 years, only to assert at the second trial that he could have done the same thing within three years. Such testimony certainly points to a consideration of future profits in calculating fair market value, particularly in view of the apparent false premise, assumption and speculation that nothing would happen within 15 years

2. State v. Tedesco, 1956, 4 Utah 2d 248, 291 P.2d 1028.

either as to demand for the material or the going price thereof per ton.

The figures of defendants' experts, averaging about $270,000 as the fair market value of the property, as compared with the figures of plaintiff's experts that averaged about $65,000, with the terrific differential of $205,000, and with the consistency of figures found on both sides, suggest a possible need to appraise appraising itself to determine how such an unrealistic disparity could exist in view of the fact that the definition of "fair market value" can be found in the first chapters of any primer on appraising.

It is cases like this, where the disparity mentioned is unexplainable and where appellate tribunals reverse not only juries but themselves on what I believe are substantially the same facts, that makes for disestablishment in the layman's mind of an erstwhile respect for courts and their pronouncements.

It seems to me that the quoted language of Mr. Justice Worthen mentioned at the outset of this dissent, and as reported in the first case, to the effect that it was apparent that defendant and his experts based their valuations on an aggregate of values arrived at by other experts appraising segments of the premises, is as apropos here as it was there.

The case should be reversed again.