**388**

393 P.2d 482

**COMMERCIAL SECURITY BANK, a corporation, Plaintiff and Respondent,**

v.

**Wayne HODSON, Jerry Morgan, M. L. Morgan, Vance Hodson, and H & M Cattle Company, a corporation, Defendants and Appellants.**

**No. 9821.**

Supreme Court of Utah.

June 24, 1964.

Crockett, J., dissented.

Barker & Ryberg, Leon A. Halgren, Salt Lake City, for defendant and appellant.

Olmstead, Stine & Campbell, Ogden, for plaintiff and respondent.

WADE, Justice.

Plaintiff Commercial Security Bank of Ogden, respondent here, sued Jerry and M. L. Morgan and Vance and Wayne Hodson, appellants here, for $32,000 on a promissory note. The defendants counterclaimed for $200,000 damages for breach of a contract by the bank in cancelling an agreement to loan them $300,000 which the bank knew

they had already commenced to use to operate a "custom-kill" of cattle with Mc-Farland, Inc., a Salt Lake City meat-packing plant, which was in financial difficulty. The H & M Cattle Company, owned by the Hodsons and Morgans and their wives, sued the bank for $200,000 damages, and the bank counterclaimed for $32,000 on the note. The two suits have identical issues and were consolidated for a jury trial.

At the trial the amount of the note not being in dispute, the appellants, the Morgans and Hodsons and the Cattle Company, produced their evidence of breach of contract and damages against the bank and rested. Thereupon the court took the case from the jury and entered a judgment for $32,000 with interest, attorney's fees and costs. It then reduced the amount of the judgment by $1.00 as nominal damages on appellants' counterclaim. No findings of fact nor conclusions of law were made, but the judge initialed a long minute entry of his views on the case.

The law authorizes a trial court to render such a judgment without submission to the jury only if the losing party fails to produce evidence which, when considered together with the inferences to be drawn therefrom in the light most favorable to the loser, fails to show a reasonable basis for a recovery.[1] After careful consideration of the evidence, we conclude that the case must be reversed and remanded for a new trial for a submission of all of the evidence of both sides to the jury to determine whether respondent bank entered into a contract to loan $300,000, and whether it breached such contract, and whether the appellants have suffered damages and if so, determine the amount thereof. In the following survey of the evidence we point out in the light most favorable to the appellants the evidence from which we conclude that the jury could reasonably find that the bank entered into a contract to loan this money to appellants, which they later cancelled and refused to live up to and thereby violated, which resulted in substantial damages to appellants. Of course, since the bank chose not to produce any evidence, after the trial judge had stated his view that the evidence would not support a judgment against the bank, we have only appellants' evidence before us.

The evidence shows that in November, 1960, Wayne and Vance Hodson owned their homes in Clinton, Davis County, Utah, with farm lands and a cattle feed lot and other property, the net value of which they claim exceeded $312,000. Jerry and M. L. Morgan owned their homes with farm land and a feed lot, and range lands and other property in Morgan County, Utah, the net value of which they claim exceeded $300,-000. The H & M Cattle Company, a cor-

1. Graham v. Johnson, 109 Utah 346, 166 P.2d 230; Rubey v. Wood, 13 Utah 2d 285, 373 P.2d 386.

poration entirely owned by the Hodsons and Morgans and their wives, was purchasing under an escrow agreement the Bar F Ranch near Kelton, Box Elder County, Utah, with its Taylor grazing rights, farm and grazing land and other property of a claimed net value exceeding $198,000. This makes a total claimed net value of all the properties in excess of $810,000.

In the fall of 1960, McFarland, Inc., to overcome its financial difficulties, proposed to the appellants a "custom-kill" arrangement whereby the appellants would supply the cattle to be slaughtered at the McFarland, Inc. plant. Another firm was then using the "custom-kill" arrangement to supply the McFarland, Inc. company with lambs. Under the proposed "custom-kill" arrangement, the appellants would supply all of the cattle processed at McFarland, Inc., paying one-half cent per pound for the processing of such beef and give the hide and offal to McFarland, Inc. The processed beef would remain the property of appellants and be marketed to McFarland, Inc.'s established customers. This arrangement was expected to make an average profit per animal processed of $16.00, which they figured would be $11.15 more than if such animals were sold on the open market. However, for McFarland, Inc. to make a profit, a sufficient number of animals would have to be processed so that the one-half cent per pound plus the hide and offal, together with the earnings from the process-

ing of lambs and hogs would be more than the operating expenses. So appellants would have to supply more cattle than merely enough to pay the operating expenses, and within limits, the more cattle processed the greater the profit would be realized by both parties.

To operate the "custom-kill" with McFarland, Inc., appellants asked the bank for a turnover or revolving loan of up to $300,-000. They proposed an arrangement whereby they could use up to that amount in supplying cattle for McFarland, Inc. to "custom-kill" in the most advantageous and convenient manner possible, without having to repay the notes or rewrite the security with each turnover. Appellants submitted to the bank financial statements of the assets and liabilities of the three businesses involved. They agreed to mortgage all of the assets of these three businesses. The bank vice-president Baker, representing the bank, stated that he could not see how they could lose. Shortly thereafter Baker in the presence of Hemmingway, the president of the bank, informed appellants that the loan had been approved by the bank finance committee. Thereupon appellants were given blank checks, and without the contemplated mortgages and notes being made or the security being investigated by the bank, they were allowed to draw in varying amounts a total of $37,000 in the course of the operation of the "custom-kill" project after signing a note in blank, which was lat-

er filled out, which is the note sued on here. Appellants were further informed that the bank would prepare the necessary papers within 30 to 60 days.

Thereafter in January, 1961, Baker informed the appellants that something had gone wrong and the loan had been cancelled. He later visited with the appellants at the Hodson home in Clearfield, and in the presence of the Hodson and Morgan families assured them that their securities were ample, but that a bank customer had threatened to withdraw a $150,000 deposit unless the loan was cancelled. Baker requested the appellants not to tell anyone of the reason he had given for cancelling the loan, stating that if they did tell, he would deny making any such statement and call them liars.

When this loan was cancelled the evidence shows that appellants were actually operating the "custom-kill" arrangement at the McFarland plant, which seemed to be going well, and that they were at that time committed to such operation, and that they could not withdraw therefrom without substantial losses. The evidence indicates that the cancellation of the loan made it impossible for appellants to continue such operation to advantage unless they could obtain another similar turnover loan up to the amount the bank had agreed to loan of $300,000. The evidence indicates that appellants were unable to accomplish the making of a substitute loan and suffered heavy financial losses. The escrow agreement to purchase the Bar F Ranch was rescinded for failure to meet their payments, and they accumulated many outstanding obligations against the Hodson property in Clinton and the Morgan property in Morgan County. The McFarland, Inc. company became bankrupt.

The following questions require consideration: 1) Would the evidence reasonably support a jury finding that the bank entered into this agreement with appellants to make a turnover loan which it later violated? 2) Does such agreement violate the statute of frauds? 3) Were only speculative damages shown?

1) The evidence is clear that after detailed discussion between the bank official and the appellants of the McFarland "custom-kill" project, and submission to the bank's loan committee, the bank informed appellants that the loan was approved and advanced as needed up to $37,000 on such loan. Although it was contemplated that papers, notes and mortgages would be prepared and signed, and title to the securities investigated, in the absence of any claim that the loan was cancelled for lack of security, and in the face of the showing of repeated statements by the bank official that the security was ample and the cancellation made for other reasons, we conclude that the evidence will support a finding that there was a breach of a binding contract to make this loan. The fact that no exact time was fixed for the ter-

mination of this loan, and that there are other immaterial terms of the contract which are not definitely fixed does not render the contract void for uncertainty, but under such conditions reasonable provisions are inferable.[2]

The evidence indicates that appellants disclosed their plan to immediately enter into the "custom-kill" arrangement with McFarland, Inc. For this purpose the bank authorized them and they did commence drawing money as they needed it on the loan by signing only a blank note, before the signing of the regular notes and mortgages, or having their security investigated, to get the "custom-kill" project started. The evidence further indicates that at this point of the operation of the "custom-kill" project it would be hard to terminate without loss. Assuming these conditions to exist, the bank would be estopped from cancelling the loan, as they did, before the project was actually well under way.[3]

2) The statute of frauds is often mentioned in the briefs but no provision thereof is cited, and the claim made thereon is not understandably explained. The exact length of time that this loan should last is not specified, but there is nothing in the evidence which indicates that the loan should not terminate in less than a year.[4] It appears that if the "custom-kill" were successfully started, the difficulty to keep it going with a new similar loan would not be hard to accomplish.

3) The evidence shows a reasonable basis for a finding of actual and not merely speculative damages. The appellants H & M Cattle Company held an escrow agreement to purchase the Bar F Ranch which was rescinded according to their evidence, causing heavy losses. The Hodsons' Clinton property and the Morgans' property in Morgan County are both now heavily incumbered with liens and mortgages as the result of the breach of this contract to make this loan. In Merchants' Bank of Canada v. Sims,[5] the Washington State Supreme Court in a case very similar to this one, held that "damages, for which recovery may be had, are such as can be said to be reasonably in the contemplation of the parties at the time of the making of the contract, and such as are the natural and proximate results flowing from the breach, and must be proved with reasonable certainty." The ap-

2. Fisher v. Bailey, 14 Utah 2d 424, 385 P.2d 985; Merchants' Bank of Canada v. Sims, 122 Wash. 106, 209 P. 1113; Bradner v. Vasquez, 102 Cal.App.2d 338, 227 P.2d 559; Ravel v. Hubbard, 112 Cal.App. 2d 255, 246 P.2d 88; Shimmon v. Moore, 104 Cal.App.2d 554, 232 P.2d 22, 23; Fraga v. Evans, 90 Cal.App.2d 529, 203 P.2d 89.

3. Kelly v. Richards, et al., 95 Utah 560, 83 P.2d 731, 129 A.L.R. 164; Farmers & Merchants Bank v. C. I. T. Credit Corp., 4 Utah 2d 155, 289 P.2d 1045.

4. Fisher v. Bailey, 14 Utah 2d 424, 385 P. 2d 985.

5. Merchants' Bank of Canada v. Sims, 122 Wash. 106, 209 P. 1113.

pellants' evidence seems to bring these requirements within this rule and the holding in that case. In a business venture of this kind there is bound to be some uncertainty. But with a project which seems certain to succeed by competent business men, the evidence cannot be considered to be merely speculative. The evidence shows that when the vice-president learned the details of the project he said he did not see how they could lose. Also the bank president seemed confident of the success of this venture, and the loan committee showed the same reaction by approving the loan. Also the appellants, who are experienced in this kind of business, were certain of their success if the dressed beef turnover loan were approved. So we find nothing that is merely speculative in this project. For it seems to have been recognized by both the bankers and the appellants as being a fairly certain business project.

All this points up a conclusion that the matter was for the jury, and that the court erred in taking it away from them.

Reversed, with directions to proceed with the trial in accordance with the views herein expressed. Costs to appellants.

HENRIOD, C. J., and McDONOUGH, J., concur in the result.

CALLISTER, Justice (concurring specially).

I concur in remanding the case for a new trial. However, if the defendants are able to establish a valid and binding contract and a breach thereof, or an estoppel, then their damages, if any, should be limited to actual, not speculative damages suffered.

CROCKETT, Justice (dissenting).

I dissent:

At the outset, it is worthy of comment that it was after the bank had sued the defendants for $32,000 which it had advanced to them that they asserted a claim against the bank for $200,000 for alleged breach of contract for failing to lend them more money. This is, of course, not controlling as to their rights, but it would seem to cast some light upon the character of the counterclaim. The main opinion very properly and fairly concedes that "it was contemplated that papers, notes and mortgages would be prepared and signed, and title to securities investigated." Obviously this was to be done before the arrangement to advance $300,000 for the proposed operation was completed. It is usually held that where parties are negotiating about a matter intending that their agreement will be reduced to writing, the fact that this was not accomplished strongly suggests that the contract was never finally agreed upon. See Building Service Employees Interntl. Union, Lodge No. 6, et al. v. Seattle Hospital Council, et al., 18 Wash.2d 186, 138 P.

2d 891; H. J. Wagner v. Rainier Mfg. Co., 230 Or. 531, 371 P.2d 74. However, I concede this does not completely foreclose the possibility of proving such an agreement where the defendants claim that the bank had so agreed and contend that $37,000 which had been advanced, was loaned under such agreement.

Conceding for the sake of argument that the evidence might support a finding that the alleged agreement was made, it is nevertheless my opinion that the trial court was correct in ruling that the defendants did not show a proper basis for recovery of damages upon their counterclaim. Under the fact as recited in the main opinion, even in the light most favorable to the defendants, it is plainly apparent that any recovery would have to rest upon a hypothesis of anticipated profits which are conjectural, and are therefore uniformly held not to be recoverable. See State by and through Road Commission v. Noble, 6 Utah 2d 40, 305 P.2d 495; Weber Basin, etc. Dist. v. Braegger, 8 Utah 2d 346, 334 P.2d 758; State v. Tedesco, 4 Utah 2d 248, 291 P.2d 1028; and Van Zyverden v. Farrar, et al., 15 Utah 2d 367, 393 P.2d 468. And in this instance not one, but two businesses would have to operate at a profit before defendants could recover on the counterclaim.

McFarland, Inc., who had already gone broke, had a proposal for a "custom-kill" to slaughter and process sheep for another company. It was proposed that in conjunction with this the defendants would also supply cattle for them to slaughter and process. For this defendants would pay ½¢ per pound plus hide and by-products, which it was expected, would result in a profit. As shown in the opinion, in order to carry on the proposed operation, McFarland would have to process enough sheep and hogs, together with sufficient cattle from the defendants, so that McFarland would make a profit; and in addition thereto, the defendants themselves would have to be making a profit in this operation as the basis for the recovery of any damages. They allege their profit would be about $11 per head more than if they had to have their animals processed elsewhere and sell them on the open market. A minor point here is that to say that it would cost $11 per head more to process the animals elsewhere and market them would itself seem to rest upon some uncertainty.

But the consideration of major importance is the contingency which necessarily exists between the mere proposal and the successful carrying out of the entire enterprise so that both companies would be making a profit. It requires no special resourcefulness of mind to perceive numerous uncertainties in such a situation which render the expectation of profits so speculative

that there is no sound foundation for an award of damages. Among them are: the availability of sheep, hogs and cattle for processing; which in turn depends to some extent upon the seasonal weather; the scarcity or abundance of feeds; the consequent instability of prices of both the feeds and the animals; the varying costs of operations, including labor and other expenses; and the efficiency of management and of operation of both McFarland and the defendants in carrying on their respective businesses. Because of the vagaries of these and other factors, I am not persuaded that the trial court was in error in ruling that defendants' anticipated profits could not constitute a proper basis for recovery on their counterclaim. Accordingly, I would affirm the judgment.

Inasmuch as the case is remanded for trial, I think it further appropriate to make this comment on the reference made to the statute of frauds: The main opinion states that this alleged oral agreement is not within the statute of frauds because it could have been fully performed within one year. It seems to me that if this be the view of the court, and the case is remanded for trial, it should be indicated that the defendants are limited to recover the anticipated profits for animals expected to be processed only within the one-year period and not beyond, which by no stretch of the imagination could reach the $200,000 for which defendants counterclaim.