Donel K. Nedrow et ux., appellees, v. Michigan-Wisconsin Pipe Line Company, a corporation, appellant.

No. 48108.

(Reported in 61 N.W.2d 687)

DECEMBER 15, 1953.

REHEARING DENIED APRIL 9, 1954.

Donald Evans, of Des Moines, and Lane & Waterman, of Davenport, for appellant.

D. W. Harris, of Bloomfield, for appellees.

MULRONEY, J.—Defendant, Pipe Line Company, brought condemnation proceedings, under chapter 472, Code, 1950, to acquire a right-of-way for its pipe line across the farm owned by plaintiffs. The sheriff's jury assessed the damages sustained by plaintiff as a result of the appropriation in the sum of $1480. Plaintiffs appealed and after an extended trial and much evidence concerning a limestone quarry on the farm, from which plaintiffs were receiving royalty of five cents a ton, and evidence of the amount of limestone that would be rendered unobtainable

by the presence of the pipe line, the trial court rendered its opinion fixing the damages for the surface in the sum of $1440 and the damage to the quarry in the sum of $100,000, or a total damage in the sum of $101,440.

I. The main error relied upon by defendant is the measure of damages applied by the trial court. We have studied the long record in this case, which has been excellently abstracted, but we think it will be sufficient to state, and quote from the trial court's opinion and findings, with only brief references to the testimony, in order to discuss the assigned error.

The trial court found the defendant had by proper procedure condemned a right-of-way, 75 feet wide and 248 rods long (approximately 6.9 acres) across plaintiffs' 200-acre farm in Van Buren County. The commissioners awarded damages in the sum of $1480 and defendant deposited this sum with the sheriff and at the time of the trial of plaintiffs' appeal from the award the pipe had been installed and was in use.

The trial court's opinion states:

"Plaintiffs' land is rather rough and not too well adapted for tillage, being more suitable for pasture land.

"That plaintiffs' land is all, or most of it, underlaid with limestone. There are two ledges of the stone, the top ledge being from 15 to 17 feet thick and the lower ledge being 58½ to 59½ feet in thickness, and the two ledges being separated from each other by a ledge of sandstone varying from 4 to 7 feet in thickness.

"The limestone on plaintiffs' land was at and prior to the condemnation proceeding under lease for the quarrying and removal at a royalty of five cents per ton, and the Kaser Construction Company as sublessee was operating the quarry and engaged in the removal of the top ledge of the stone. The quarry had been in operation since August 1946, and plaintiffs had been receiving a royalty on the rock quarried, crushed and sold amounting to approximately $4000 per year.

"The evidence shows that the rock is of such quality in both the upper and lower ledges as to be suitable for both agricultural and road construction purposes, and that there is, and apparently will continue to be, a demand for such rock in the

quantities being produced for as long a time as is now foreseeable in the future."

Here it might be pointed out the record shows the Nedrow farm was close to the Davis County line and the original royalty lease was with the Davis County Soil Conservation District and it gave the district exclusive right to quarry and process limestone on the farm by paying five cents a ton royalty for ten years from 1945, subject to plaintiffs' right to cancel the lease if the district failed to produce at least 2000 tons in any twelve-month period. Following this lease the lessees made a contract with the Kaser Construction Company in April of 1946 for the quarrying of the limestone for six cents a ton royalty. The contract with Kaser was for three years renewable for additional three-year periods by mutual consent and it recognizes Kaser will operate with portable equipment and maintain a stock pile, and the royalty was to be paid when the product was sold. The record shows Kaser operated about six months out of the year, producing stock piles of lime rock for agricultural purposes and for road rock purposes from which piles there was sold in the four years 1946 to 1949 about 168,706 tons of agricultural lime rock and 117,287 tons of road rock.

The trial court's opinion goes on to say: "The question thus presented is how much less is plaintiffs' land worth with the right-of-way and pipe line thus located across it than it was before the condemnation was effected."

This was a strip mining operation where the overburden of dirt is removed and the rock blasted out by dynamite. The trial court went into a discussion of the evidence of how close to the pipe line the quarry operator could safely blast, deeming that "the principal and most difficult question in the case." He did not feel the evidence of quarry tests "reliable" and, mostly on the authority of a Government Bulletin (where the shock effect calculations started at 500 feet) he concluded it would not be safe to blast within 500 feet of the pipe line and he stated: "I make my calculations on this basis." The opinion then states:

"The next problem presented is the amount of damages sustained by the plaintiffs from the construction of the pipe line. Of course, the amount of damages is the difference in value

of the farm as a whole before and after the construction of the pipe line across it. Ordinarily it is the difference in the market value just before and after the taking by condemnation.

"In this case, however, there is no evidence of any comparable land sales charged with such burden. In fact, there is no evidence of any property selling on which there is any comparable quarry or royalty return. The testimony of Mr. Sargent that the land as a whole is worth $2000 less is as ridiculous as plaintiffs' claim that it is worth $12,000 per acre.

"I conclude the land has no ascertainable market value because there are no sales of like lands so developed and producing similar rentals or royalties in this part of the United States. If we accept the Court's conclusion that it is unsafe to blast within 500 feet of the pipe line, then there is little or no rock on the three 40s that can be removed with the pipe line in operation thereon.

"In arriving at the value of the land it is always permissible to take into consideration what it is reasonably capable of producing in the way of income and in this case it is the principal factor that should be taken into consideration. The finding of the sheriff's jury that the damage to the farm was $1440 [elsewhere in the record this is $1480] was a reasonable allowance for the damage to the surface, but it is grossly inadequate to compensate the plaintiffs for the loss of the royalties of $4000 per year for a long period of years."

The court then had recourse to some map exhibits. He found the top ledge could be profitably mined wherever the overburden was not more than 40 feet and he had "no doubt" that after the top ledge was mined a "practical quarry operator" could remove the 58½ feet of limestone in the lower ledge after first removing the seven feet of sandstone on top of it. The maps, based on core drillings, showed him the area lying within 500 feet of the pipe line where the overburden was not over 40 feet and he computed "a total of 40,608,750 cubic feet of rock" could be economically quarried "but for the pipe line." By resort to the evidence showing the weight of a cubic foot of limestone the court went on to arrive at the following computation of damages: "* * * assuming, as the evidence shows, a cubic

foot of limestone weighs 160 pounds, we have a total of 3,248,700 tons of limestone on which if quarried and sold the royalty at five cents per ton would amount to $162,435.

"But this is not the measure of the damages, since this sum would be payable at the rate of $4000 per year consequently it would not all be paid until 41 plus years elapse from the commencement of the removal of the stone. It is further shown that the operation on the areas computed would not commence for a period of from three to five years, it would mean that payments would not be completed for 46 plus years. The payments would commence in five years and continue for a period of 41 years. The present worth of this sum is the measure of plaintiffs' loss by reason of being prevented by the pipe line from removing the stone in the areas above set out."

The opinion then fixed the plaintiffs' damages as the present worth of $162,435 payable $4000 a year for forty-one years beginning five years from date, fixing the value of the use of the money at $2\frac{1}{2}\%$ per annum and arrived at a figure of $100,000 and then held: "Assuming the correctness of the computation the amount of plaintiffs' damage is $1440 damage to the surface plus $100,000 or a total of $101,440."

■ II. The assignment of error in defendant's brief is: "The court erred in awarding to the Nedrows the amount of royalties of which it assumed they would be deprived by the existence of the pipe line across their land." The admissibility of the evidence of royalty income and the presence of undeveloped limestone was not challenged and such evidence was proper as having a direct relation to the value of plaintiffs' farm.

■■ The foundation finding for the damage award in condemnation is the value of the property before condemnation. If it can be established that there is a market for the property, by evidence of a general buying and selling of that kind of property, the first finding will be the market value. But if the nature of the property be such that no market for that kind of property can be ascertained or established, the primary finding will be intrinsic or actual value of the property. Once the value is found before condemnation, either market or actual as the case

may be, the next question is the value after condemnation. If the whole of the property is taken the first finding of value is the measure of recovery. If part of the property is taken the measure of recovery is the difference between the finding of value of the whole property before condemnation and the finding of value of the remaining property after condemnation. These general principles are all firmly established by all of the authorities. 29 C. J. S., Eminent Domain, sections 136–139; 18 Am. Jur., Eminent Domain, section 242. But the point we wish to emphasize in this case, where there was a partial taking, is that the measurement of damages must start with a finding of value of the property, either market or actual, before condemnation. The ultimate determination of the amount of damages must build on the foundation of a formed judgment that, before condemnation, the whole of plaintiffs' farm was worth on the market, or actually to plaintiffs, so many dollars. We can accept the trial court's finding that market value was not ascertainable and go forward with the quest for actual value. That determination must be made at the very threshold of the case, for the condemner is never required to pay more than the full value of condemnee's land, and, if the taking is less than the whole, the condemner pays that much less than the full value as the value of the part not taken bears to the value of the whole.

The error in this case lies in the trial court's finding, or it might be said lack of finding, of the value of plaintiffs' farm before condemnation. Great liberality is usually allowed in the introduction of evidence of items and elements which can and should be considered on the question of value of the property. But all of the cases caution against the use of these items and elements for anything more than permissible considerations on the question of value. For instance in Ranck v. City of Cedar Rapids, 134 Iowa 563, 565, 569, 111 N.W. 1027, 1028, a livery stable owner whose property was being condemned was allowed to show the value of his livery stable and the business carried on therein, but the opinion states: "* * * proof of such facts is admissible—not as affording a measure of recovery, but as tending to disclose the real character and condition of the property—and support the estimates of value given by the witnesses."

This opinion states the general rule that "the owner is entitled to have the jury informed of all the capabilities of the property, as to the business or use, if any, to which it has been devoted, and of any and every use to which it may reasonably be adapted or applied." And the opinion enumerates a great many items which courts have held proper for owners to prove, but it warns: "these items are not to be considered as in themselves affording a basis or measure of recovery, but as explaining and supporting the estimates made of the value of the property as it stands."

One of the items enumerated in the Ranck opinion (at page 566 of 134 Iowa) as being proper proof by a landowner to support value estimates is "the presence and value of undeveloped mineral deposits in the land taken, Doud v. Railroad Co., 76 Iowa 438."

In the Doud case the landowner was permitted to show his land, condemned for a railroad right-of-way, contained coal, the opinion stating at page 439 of 76 Iowa: "The evidence was introduced to show the true character of the land, and had direct relation to its value as an entirety. No attempt was made to show the separate value of the coal which underlay the right of way. The jury were instructed that the mineral beneath the surface belonged to the owner of the land, and that it could be considered by them only so far as it affected the market value of the land."

In 156 A. L. R. 1416, 1418, the annotator gives the following as the basic rule in condemnation as to valuation of land containing minerals:

"With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land. * * *

"Occasionally the rule has been expressed by the negative statement that the award may not be reached by separately evaluating the land and the deposits, since the latter, being only one element among many in determining the market value

of the land, cannot be considered as an independent factor the value of which is to be simply added to the value of the land."

In some jurisdictions the separate value of the rock in the land is barred as evidence. See Strouds Creek and Muddlety R. Co. v. Herold, 131 W. Va. 45, 45 S.E.2d 513, and also the discussion in Hayes v. Chicago, R. I. & P. Ry. Co., 239 Iowa 149, 30 N.W.2d 743, where we recognized that there is much authority in other jurisdictions to the effect that the separate value of improvements cannot be shown. But in any event the rule in all jurisdictions is that it is improper to consider evidence of the separate value of the rock as constituting a separate element of recovery.

In 156 A. L. R. 1423 the rule is stated: "It is a general rule that in ascertaining the amount of compensation to be awarded for taking property containing mineral deposits in eminent domain, the amount of the mineral deposits cannot be estimated and then be multiplied by a fixed price per unit. The reason for this rule is said to be that the estimate as to the quantity and quality of the minerals in the land constitutes mere speculation and that, furthermore, even if such amount could be exactly ascertained, the costs of mining and the profits made therefrom would still be uncertain, since the contingencies of the business could not be estimated with any fair degree of certainty."

The many cases cited in the annotation support the conclusion expressed in the above rule. Two cases which are pointed to as leading cases are Searle v. Lackawanna & B. R. Co., 33 Pa. 57, cited in Reading & Pottsville R. Co. v. Balthaser, 119 Pa. 472, 13 A. 294, and Orleans County Quarry Co. v. State, 172 App. Div. 863, 159 N. Y. S. 30. In the Reading case witnesses gave testimony and based their estimates of value on the value of limestone under a right-of-way taken by a railroad in condemnation. In holding this error the court stated at page 482 of 119 Pa., page 297 of 13 A.:

"It is almost unnecessary to argue the incompetency of that kind of testimony. Its character and effect were fully pointed out in the opinion of this court in the case of Searle v.

Railroad Co., 33 Pa. 64. We there held that the value of the land as coal land could be allowed, but not the value of the coal itself underneath the road. We said: 'We do not measure the value of land by such facts. Land may have $4000 worth of coal per acre in it and yet sell at $40 per acre. When a man has to sell his property, of course he must take the market value for it.' And so in this case the value of the plaintiffs' land as limestone land was a proper subject of consideration, both by the witnesses and the jury, in estimating the damages, but not the value of the stone under the road. Practically this distinction was disregarded when the objectionable testimony was retained and more of it given, and herein there was error. The doctrine of Searle v. Railroad Co. has never been departed from, nor is it likely to be. It is founded upon sound principles and practical common sense."

In the Orleans case the valuation of quarry property was fixed by figuring the value of the stone in the ground. The court held this error and observed on page 865 of 172 App. Div., page 31 of 159 N. Y. S.: "There is no limit to the value of a quarry, or sand bank, or clay bank, if an estimate can be made of the amount of stone, sand or clay which can be taken and a fixed price put upon it. * * * the fact remains that there are many quarry lands in the locality, and such lands have only been sold by the acre, and if all the quarry land in Orleans County can be sold by fixing the value of the stone in situ, the wealth of the county is beyond reasonable estimation."

A few other cases where courts have held it improper to consider evidence of the separate value of the rock as constituting a separate element of recovery are: United States ex rel. T.V.A. v. Indian Creek Marble Co., 40 F. Supp. 811; United States v. Certain Lands in Towns of Woodbury and Highlands, 52 F. Supp. 314; United States v. 620.00 Acres of Land in Marion County, Arkansas, 101 F. Supp. 686; Ross v. Commissioners of Palisades Interstate Park, 90 N. J. Law 461, 101 A. 60. See also 4 Nichols on Eminent Domain, chapter XIII, section 13.22, page 243.

Illustrative of the holdings in these cases is this statement taken from United States ex rel. T.V.A. v. Indian Creek Marble

Co., 40 F. Supp. 811, at page 822.: "Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all businessmen know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. * * * Values fixed by witnesses on such a basis are practically worthless, and should not be accepted. To the extent the valuation fixed by any witness contains this speculative element, to the same extent is its value as evidence reduced."

█ It would be well at this point to take a look at the value testimony in this case. Plaintiffs purchased one hundred sixty acres of their farm in 1942 and the other forty acres in 1945, for $15 an acre. The fact that there was limestone on the farm does not seem to have been unknown. There were outcroppings along a creek on the farm and there is evidence, as one witness put it, that there had "been some quarrying done there spasmodically before the present operation." This witness told of a former owner of the Nedrow farm, his grandfather's brother, quarrying some limestone on the farm for agricultural use, in the late twenties. The purchase price paid for land is some evidence of its market value unless the purchase was so remote from the time of condemnation as to have no bearing on its value. Hayes v. Chicago, R. I. & P. Ry. Co., 239 Iowa 149, 30 N.W.2d 743.

The assessment roll in 1949, shortly before the condemnation proceedings, and three years after the quarry operator

started producing limestone, shows a valuation of $20 an acre for one hundred twenty acres, and $29 an acre for the balance. This assessment roll was signed by Mr. Nedrow and it was some evidence of value of the farm. Duggan v. State, 214 Iowa 230, 242 N.W. 98. The assessor testified that he knew in a general way whether land in Van Buren County was underlaid with stone and this was considered in fixing values.

Plaintiffs' witness Carson testified the Nedrow farm of two hundred acres was worth $12,000 an acre. On cross-examination he did state that he would "imagine Mr. Nedrow would consider selling his land for a little less than $2,400,000." The plaintiffs and one other witness testifying for them also said the farm had a value of $12,000 an acre before the condemnation. These witnesses said the farm had a value of $40 an acre after the condemnation, and Mr. Carson said its value after the condemnation would be that figure obtained by subtracting from the value before condemnation the number of acres, at $12,000 per acre, that would be rendered unquarriable by the presence of the pipe line. This is the evidence that the trial court called ridiculous. We agree with the court's characterization of this testimony, though we might point out his award based on his finding of area unquarriable by reason of the pipe line would be a price per acre not far from the $12,000 figure that he was branding ridiculous.

Two of defendant's value witnesses placed values on the farm without considering the presence of limestone. One said the value was $40 an acre before condemnation and $35 an acre after. The other said $30 an acre before condemnation and $28 an acre after. A third value witness for defendant was Mr. Sargent. He had twenty years experience as a quarry operator and he owned, either personally or through corporations in which he was an officer, some ten quarries located in Iowa, including one in Van Buren County. He had made many purchases of land with rock production in mind and in all cases the seller knew he was selling for use for that purpose. Three purchases had been made in the Nedrow area. He had purchased land for limestone production in Van Buren County in 1949 for about $30 an acre and the seller knew the land was being

sold for a quarry. He had inspected the Nedrow farm and the quarry and he testified the fair and reasonable market value of the Nedrow farm before the condemnation was $20,000 and the value afterwards not less than $18,000. The trial court called the defendant's value testimony as ridiculous as the plaintiffs'. It is a little difficult to see how that term can be applied to Mr. Sargent's testimony. It is too well fortified by actual experience. He took into consideration the fact that there was undeveloped limestone present in the land, and in fact that there was a portable quarry machine operating on the land at the time. But, as he pointed out, the quarry operator was not bound to produce any limestone, and in the quarry business "quarry sites and individual operations are always changing because they are finding something a little better, less stripping, more available to the market or closer to the market to haul."

We can only understand from the trial court's opinion that he discarded all of the value testimony as unbelievable. He stated that the amount of damages sustained is "the difference in value of the farm as a whole before and after the construction of the pipe line across it." Then he concluded the farm "has no ascertainable market value." Then the court seemed to feel that his finding that the farm had no ascertainable market value relieved him from all duty to find any value at all and opened the door for the application of a measure of damages based on the loss in terms of royalty the plaintiffs would sustain if the rock which was rendered unquarriable by the presence of the pipe line actually were quarried and sold. In other words, the trial court made the mineral deposit in the land taken the measure of damages. This is definitely not the law under all of the authorities.

We have heretofore pointed out that the general rule obtains as to condemnation of mineral lands—the market value before and after—and the evidence of mineral deposits is only a permissible consideration, not a yardstick by which to measure damages.

We have not bothered to examine the finding of the trial court that there was no ascertainable market value for plaintiffs' farm. In the sense that plaintiffs did not introduce evidence of

sales of similar land it might be said the record did not establish a market but several of plaintiffs' witnesses knew of transfers of similar land for rock purposes and defendant's witness Sargent told of such sales. Without holding the record justifies resort to intrinsic value, we hold that value cannot be established by finding the amount of rock in place and measuring the recovery by the amount rendered unquarriable by the taking, multiplied by the royalty figure.

III. Much of plaintiffs' brief is devoted to an argument that the trial court did follow the rule of the value of the farm before and after in assessing the damages. We will waste no time on this for we feel we have set forth sufficient of the trial court's opinion to show beyond a doubt that he measured the damages by computing loss of royalties on the rock he found would be unquarriable by the presence of the pipe line.

IV. Plaintiffs' next answer is that, admitting "the trial court made an award based solely and entirely on income from royalties, then under the record in the case the theory of the trial court was right and the court employed the proper measure of damages." The plaintiffs seem to argue this right to employ a different measure flows from the trial court's finding that the plaintiffs' land had no ascertainable market value— that in the inquiry for actual value, the court is free to discard the before-and-after rule, and apply a different measure for awarding damages such as the capitalization of income that will or might be lost by reason of the taking. The contention will not stand examination. It requires making constant, factors, which the history of private business in this country shows are variable. As applied in the instant case the measure the trial court employed required a finding as to market conditions and production costs that will prevail on into the future for at least forty-six years. It assumes there will be no new techniques developed for removing and processing limestone or indeed some cheaper substitute found that will supplant the use of limestone for road and agricultural purposes. Perhaps we can best illustrate the fallacy of this method of measuring damages by going back to the Ranck case where the livery stable owner was allowed to support the value estimates by showing his present income from the livery stable business. Suppose in that case, decided

in 1907, instead of using the income to support value estimates the court had decided the automobile that was then beginning to join the stream of traffic was only a passing fancy, and allowed the assessment of damages measured by the income the owner then received from his livery stable, projected on into the future on a capitalization plan. The application of such a foretelling measure of damages would look a little ridiculous a few years later. As stated in United States ex rel. T.V.A. v. Indian Creek Marble Co., supra, on page 822 of 40 F. Supp.: "It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation."

Nor will the fact that plaintiffs' income is in the form of royalties, rather than business profits, relieve the measure employed, from its speculative character. The present quarry operator has a right to continue operations until 1955 but he is under no duty to do so. We can assume no quarry operator will continue to remove rock and pay plaintiffs' royalty if the oper ation becomes unprofitable. In a sense the plaintiffs are in business with the quarryman for they will receive royalties according to the business fortune of the operator. The limestone vein does not stop with plaintiffs' line fence. The record shows by plaintiffs' witnesses that lime rock is plentiful in this area for at least a couple of miles around plaintiffs' farm and there are mineral leases on land adjoining plaintiffs'. The quarryman testified there are five quarries operating which compete with him in his four-county market area. This record shows the market for the quarry product is in a perilous position. To a large extent it depends on a government subsidy to farmers for the agricultural limestone and government appropriations for roads for the road rock.

The cases plaintiffs cite do not support the employment of the measure adopted by the trial court here. They do not hold the loss of income *is the measure.* They are cases adhering to the general rule where evidence of the presence of minerals in the land or income from the use of the property was held admissible and proper items for consideration on the question of value of the property before condemnation. Korf v. Fleming, 239 Iowa 501, 518, 32 N.W.2d 85, 95, 3 A. L. R.2d 270, relied upon

by plaintiffs, quotes the language of the Ranck case with approval, including the cautionary expression: "* * * these items are not to be considered as in themselves affording a basis or measure of recovery, but as explaining and supporting the estimates made of value * * *."

In Des Moines Wet Wash Laundry v. City of Des Moines, 197 Iowa 1082, 1090, 198 N.W. 486, 490, 34 A. L. R. 1517, the other Iowa authority relied upon, the plaintiff was the lessee of property taken in condemnation. The court allowed testimony of a variety of elements but the opinion holds: "It is evident from the verdict returned that the jury understood and correctly interpreted the instruction, and treated the evidence, not as items of damage, but as an essential guide in determining the value of the leasehold taken."

We have not discussed other assigned errors nor all of the brief points urged in plaintiffs' brief in support of the trial court's judgment. The central error in the case is the employment of a wrong measure of damages. The presence of that error makes reversal as mandatory in a law case tried to the court as it would if tried to a jury and the jury instructed on the wrong measure of damages. The judgment is reversed.—Reversed.

All JUSTICES concur.