## KNOX LIME COMPANY

v.

## MAINE STATE HIGHWAY COMMISSION.

Supreme Judicial Court of Maine.

June 13, 1967.

Verrill, Dana, Walker, Philbrick & Whitehouse, by John A. Mitchell, Roger A. Putnam, John L. Sullivan, Portland, for plaintiff.

Lester A. Olson and Atwood C. Nelson, Legal Div., Maine State Highway Commission, Augusta, Sidney W. Wernick, Portland, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, DU-FRESNE and WEATHERBEE, JJ.

WEATHERBEE, Justice.

On report. We are concerned here with the taking by the State for highway purposes of a strip of land owned by Byron M. Clark in which the mineral rights were owned by the plaintiff.

On March 1, 1960 the Great Northern Paper Company was the owner of the plaintiff corporation. The plaintiff had been mining limestone on the reference property for the use of the parent company in its mills. Prior to March 1, 1960 the Great Northern Paper Company altered its manufacturing processes and discontinued the use of paper rock and on that date the plaintiff conveyed to Lime Products Corporation the right to enter and remove the limestone

from its quarry, the Union Quarry, for a period of three years. Mr. Harold B. Kaler was then president and stockholder of Lime Products Corporation and that corporation commenced production in the quarry late in the Spring of 1960. In 1962 Mr. Kaler and others acquired from the Great Northern Paper Company the ownership of the plaintiff corporation and Mr. Kaler became plaintiff's president. Plaintiff issued a new lease to quarry lime rock to Lime Products Corporation on September 1, 1962 and thus became in effect a holding company.

Thus in early 1960 the fee in the land was owned by Mr. Clark, the plaintiff was the owner of the mineral rights in the reference parcel and Lime Products Corporation had the rights under the lease to quarry lime rock.

On March 30, 1960 the defendant condemned and took for public use a strip of land crossing this parcel containing 1.6 acres. Mr. Clark participated in a hearing before the Land Damage Board as a result of which the Board fixed compensation for the taking in the amount of $700.00. Plaintiff, the owner of the mineral rights, received no notice of this hearing and did not participate in it and when notified of the award filed timely notice of its appeal to the Superior Court in Knox County. There the parties agreed to submit the matter to hearing before three referees.

The referees heard the matter during five days in the Spring of 1965. The greater part of the numerous objections made by the defendant concerned offers by the plaintiff of testimony concerning the present worth of anticipated future earnings and of anticipated future royalties, often referred to as capitalization of income and capitalization of royalties. A large part of plaintiff's evidence as to value was based in whole or in part upon these methods and the referees admitted this testimony *de bene* with its admissibility to be determined by them at the conclusion of the trial.

When the testimony ended, however, the parties agreed to report the matter to this

Court without a decision by the referees and it was ordered so reported in accordance with M.R.C.P. Rule 72(b) to be determined by us as the rights of the parties require upon the pleadings, docket entries, exhibits and such testimony presented before the referees as we determine to be legally admissible.

Our problem is complicated by the fact that counsel are now unable to agree on the manner in which the case was presented to the referees, plaintiff's counsel contending that the issue to be determined was the value of the mineral resources alone and defendant's counsel insisting that the plaintiff was to be treated as though it was the owner of the fee, but disregarding the previous award to Mr. Clark.

It appears to us that due to some misunderstanding as to plaintiff's ownership of the mineral rights, the hearing before the Land Damage Board proceeded on the theory that Mr. Clark was the sole owner of the reference property and no consideration was given to plaintiff's interest in the mineral rights. Defendant's counsel, in their brief, conceded that the award to Mr. Clark was independent of any value enhancement of the land by virtue of the fact that it contained minerals. Although the parties may not have fully understood each other's position, it appears to us that the defendant, realizing that plaintiff had been in some manner deprived of its opportunity to present its claim before the Land Damage Board, had waived possible technical objections and had joined in asking that plaintiff be compensated for its damages, in spite of the fact that one award for damage to the property had already been given. The chairman of the Board of Referees said to the parties:

"THE COURT: Besides all the formalities or errors of omission or commission in the past we are now down to the question of what the owner of this *mineral deposit* is entitled to as result of the construction of this road and this taking. As I understand it, all prior sins of omis-

sion or commission have been forgiven and we are down to that fundamental issue, and as far as this Board is concerned, we are not going to be concerned about the question of ownership." (Emphasis supplied)

It was evidently the intention of the defendant and the referees to restore plaintiff to the same position it would have been in if it had received the required notice and participated with Mr. Clark in the hearing before the Land Damage Board—that is, to be awarded fair compensation by the referees, as it should have been by the Land Damage Board, for the damage to its interest in the property. That interest was the ownership of the mineral deposit.

It does not appear necessary to adopt the fiction that plaintiff is to be considered as the owner of the entire fee as defendant proposes that we do. It is true that the general rule is often stated to be that the value of mineral resources in the earth cannot be determined separately from the land. It appears, however, that the many cases using this language are ones where the title to the surface and the mineral resources are in the same person. In such cases (and when all interests in the property are being determined in the same action) the test is the value of the whole property, considered as land, enhanced (if it is enhanced) by the value of the minerals. These courts are in fact only recognizing that the value of the mineral deposit cannot be determined separately and added as a separate unit to the value of the land. Hollister v. Cox, 131 Conn. 523, 41 A.2d 93, 156 A.L.R. 1412 (1945); Atlanta Terra Cotta Co. v. Georgia Ry. & Elec. Co., 132 Ga. 537, 64 S.E. 563 (1909); Searle v. Lackawanna and Bloomsburg Railroad Co., 33 Pa.St. 57 (1859); Ringwood Co. v. North Jersey District Water Supply Comm., 105 N.J.L. 165, 143 A. 369 (1928); Nichols on Eminent Domain (3d ed.) Vol. 4, § 13.22; 27 Am.Jur.2d, Eminent Domain, § 290. With this we agree.

In Lime Rock R. R. Co. v. Farnsworth, 86 Me. 127, 29 A. 957 (1893), the plaintiff had taken by eminent domain a strip of land in which the limerock and other mineral rights were owned by the defendant. The plaintiff had settled with the owner of the remainder of the land. This court then approved of making a separate determination of the damage to defendant's mineral rights, adding on page 132, 29 A. on page 958, as dicta,

" * * * we have been shown no reason why the rules and principles applicable in other cases of assessing damages for taking land are not applicable in this case. If Mrs. Farnsworth's interest in the land had no market value just before the taking, she has not suffered any legal damage. If her interest then had a market value, how much was it reduced by the company's action would seem to be the question. The existence and the depreciation of the market value can be determined in this case by the same kind of evidence as in other cases."

Courts in other jurisdictions have found no objection to compensating separately the owner of mineral rights when the fee to the land was in another. State by and through State Highway Comm. v. Arnold, 218 Or. 43, 341 P.2d 1089, 1104, 343 P.2d 1113 (1949); Comstock v. Iowa State Highway Commission, 254 Iowa 1301, 121 N.W.2d 205 (1963); Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F.2d 182; United States v. 4.553 Acres of Land, 208 F.Supp. 127 (D.C.1962); 29A C.J.S. Eminent Domain § 174.

Our problem then is to decide from the pleadings, the legally admitted testimony, exhibits and docket entries, what damage was occasioned to the fair market value of plaintiff's interest in the limestone reserves in the reference parcel as a result of the State's taking.

At this point, a summary of the evidence is necessary to an understanding of our rul-

ings on admission or rejection of certain testimony.

Knox County has a number of limestone deposits of economic value and quarrying this rock has played a significant role in the economic life of the area for several decades. There are several such deposits in the general area which were discussed here and they vary somewhat in their chemical content. The various classes of limerock are marketable for different uses. That with a high calcium content (containing 53.25% calcium oxide or higher—known as "paper rock") is particularly suitable for use in the paper industry in mills which use that rock in their manufacturing processes. It also finds a market as an element in poultry feed and in the sugar beet industry. Calcium limerock furnishes raw material for the cement industry, and the greatest use for low calcium rock is as fertilizer when it is known as "agricultural limestone". Stone with a high calcium content can profitably be mixed with a lower grade material to produce marketable agricultural limestone, and limestone with a high magnesium content is also used to make this product. Much of the limestone is laid down in irregular strata of varying mineral content and geological developments have folded much of the strata in varying degrees so that it is found at varying depths. The depth of the deposit and the amount of overburden which must be removed in order to extract it are among the controlling factors in determining the value of the deposit.

During the 1950's, and up to the date of taking, a number of persons became familiar with the deposit in question, which is known as the Union belt, and several studies were made of it by geologists. This is a deposit of limestone something less than a mile long and striking in a northeast direction. That part of it which lies under Mr. Clark's land north of the old Route 17 is approximately 1500 feet long and 250 feet wide at its greatest width. It was observed and studied by knowledgeable people who expressed in testimony and in written reports their opinions as to its high calcium quality, width, depth, comparative accessibility and its suitability for commercial use. Their opinions were founded upon inferences which they drew in the light of their experience, from observation of the terrain, of outcroppings of rock on the surface, of old small open pits and of the walls of plaintiff's operating quarry.

After the taking in 1962, a new plant was constructed by Lime Products Corporation south of the old Route 17 at the south end of the old quarry and more sub-surface area was exposed by the further operation of the old quarry. In addition test holes were drilled by the parties to this action, some at great depths, both vertical and at angles, and cores of rock thus obtained were examined. All of this added to the knowledge concerning the actual location, structure and composition of the limestone belt. Some witnesses expressed opinions that these later drillings revealed that the overall quality of the reserves is lower than was originally inferred and that an unexpected interruption of the lateral continuity of the structure casts doubt upon the original optimistic estimates of very high quantity. The witnesses were in dispute both as to the quality and the quantity of the limestone involved and the difficulty of removing it.

Of course, limestone reserves are of value only if they can be extracted from the earth and marketed profitably and witnesses disputed whether the effect of the taking, which divided the reference area into two sections, actually resulted in each being so small as to be unsuited for appropriate mining procedures and therefore worthless. Much of this testimony was admitted over objections which must now be examined.

Defendant's objection #1. The plaintiff offered plaintiff's Exhibit #1, a copy of Special Mineral Economic Report #1 published by the Department of Economic Development in 1959. Robert G. Doyle, the State geologist, testified that Donald Shaw, a graduate student then studying for his doctor's degree, worked under Mr. Doyle's direction and control in preparing this re-

port for the Department. It is a survey of the potential of industrial mineral production in the State of Maine, including reference to the limestone resources and market conditions. Mr. Doyle prepared the section dealing with geology and Mr. Shaw wrote that concerning the market potential. The details as to marketing conditions were obtained from a series of inquiries from buyers, sellers and consumers over a three-State area. The report was then published by the Department of Economic Development and made available to interested parties. The defendant objects that the report was hearsay. The Board admitted the report *de bene*.

■ Some of that part of the report dealing with the geological features are conclusions of Mr. Doyle based upon his own observations and experiences. The remainder is objectionable as hearsay unless considered an exception to that rule as an official publication, which the plaintiff urges it to be. The general rule is that where some statute requires or authorizes a public official to make a written statement of matters or facts pertaining to, and as part of his official duty, such statement is competent evidence of the matter or fact.

This Court in 1852 admitted the records of a city as evidence of the date a street was widened, saying:

"The city has power to lay out and alter streets; such acts are of a public nature, the whole community are interested in them, and those who perform and record them are the agents and servants of the public. Such public officers discharge their respective duties under the sanction of their official oaths. The records are the evidence of the facts of which they speak, and they are required to perpetuate the knowledge of them; they are equal to ordinary testimony given under the obligation of an oath, and in relation to remote events, they are more satisfactory than the recollection of witnesses. As they are of a public nature, they are open to all, and they may be introduced in evidence whenever the interest of any one requires an exhibition of the facts which they contain. It is on account of their public character and bearing, that any one may resort to them as a justification for the appropriate use of the land over which streets and highways are located, and the same reason would authorize their introduction to establish the truth amid conflicting testimony, in the ordinary investigation of facts." Barker v. Fogg, 34 Me. 392, 393 (1852).

■ A similar ruling was made in City of Auburn v. Union Water Power Company, 90 Me. 71, 79, 37 A. 335, 337 (1897) as to city clerk's records of election of officials, and in Hunt v. Card, 94 Me. 386, 391, 47 A. 921, 922 (1900) as to proof of notice by county commissioner's records. However, not every report of a public officer is an official report within the meaning of the rule. We believe that the applicable law is correctly stated as follows:

"It is a well-recognized general rule that official records and written reports of a public nature which public officers are required, either by statute or by the nature of the duties of their office, to keep of transactions occurring in the course of their public service, made either by the officers themselves or under their supervision, are ordinarily admissible in evidence as proof of the facts recorded therein, so far as they are relevant and material to the particular inquiry, although the entries have not been testified to by the persons who actually made them and although they have, therefore, not been offered for cross-examination." 20 Am.Jur., Evidence, § 1023.

■ The report must be a record of facts and not the opinion of the official.

"In order to be admissible, a report or document prepared by a public official must contain facts and not conclusions involving the exercise of judgment or discretion or the expression of opinion. The subject matter must relate to facts

which are of a public nature, it must be retained for the benefit of the public and there must be express statutory authority to compile the report." Steel v. Johnson, 9 Wash.2d 347, 115 P.2d 145, 150 (1941).

In Maine, however, the act does not have to be one expressly authorized by statute. In Greene v. Martin, 101 Me. 232, 234, 63 A. 814, 815 (1906) this Court held that a county treasurer's record of a tax sale is admissible evidence of the sale even though the statute did not expressly require a record to be kept because the Court said the duties of the officer could not be adequately performed without his keeping a permanent record of such sales and that such record, therefore, is admissible as an official book. In Penobscot Chemical Fibre Co. v. Bradley, 99 Me. 263, 270, 59 A. 83, 86, (1904) the records of valuation placed upon other taxable property were considered to be the recorded opinions of the assessors and not admissible as evidence of valuation of that property.

10 M.R.S.A. § 651, creates the office of State Geologist and subsections 1 and 2 establish a revolving fund to cover "printing and distribution costs for geological and related technical literature" and authorize the Commissioner of Economic Development to fix the price at which such publications may be sold.

■ The Shaw report is not a record of a primary fact but a report of an investigation conducted by the makers whose conclusions are based upon their own discretion and opinions. There was no express statutory authority to compile it and it was not essential to any express statutory duties. We conclude that it is not admissible as an exception to the hearsay rule. The defendant was entitled to have the asserted facts presented by witnesses who were subject to cross-examination.

Plaintiff's Exhibit No. 1 is excluded.

Defendant's objections #2, #3, and #4. These were to the admission of plaintiff's #2, the so-called Cheney report, and plaintiff's #3 and #4, the accompanying maps.

In 1962 the Maine Geological Survey, a division of the Department of Economic Development of the State of Maine, employed Dr. Eric Cheney, then a final Ph. D. student, to study and prepare a survey of the limestone belt between Rockland and Augusta. At the time of hearing, the report and maps were being printed for distribution by the State of Maine and they were offered as official State documents.

■ This report describes the various limestone formations found in northwestern Knox County and the comparative quality and quantity of their mineral reserves and consists largely of the opinions and conclusions made by Dr. Cheney on the basis of his experience, knowledgeable observations and study. There was no statutory authorization for the Cheney report and it is not the recording of a primary fact by a public official. It fails to meet the requirements of a public record and so it is excluded as hearsay.

Plaintiff's Exhibit No. 3 is a regional map of the geology of northwestern Knox County. It was prepared by Dr. Cheney from his own field work in 1963. It portrays the pertinent geological formations of the area as inferred by the maker from his observations of the nature and position of outcroppings of rock and from the exposed areas in quarries.

Plaintiff Exhibit No. 4 is a larger scale map of the Union Quarry area prepared by Dr. Cheney in 1964 from similar observations including additionally an observation of the western area of the Union Quarry which had been exposed by quarrying since he prepared Plaintiff's Exhibit No. 3. It portrays Dr. Cheney's conclusions as to the nature, mineral content, size and dip of the strata. In addition it shows the location and description of four drill holes drilled by Mr. Rand and testified to by him without objection. These were drilled after Plaintiff's Exhibit No. 4 was

prepared but were included by Dr. Cheney for reference.

Dr. Cheney appeared as a witness, identified Plaintiff's Exhibits No. 3 and No. 4 and in direct and cross-examination explained to the referees his conclusions as to the geological data illustrated by the two maps and the bases for those conclusions. His qualifications as an expert in the field of geology were not disputed and his opinions were properly presented for the referees' consideration. Plaintiff's Exhibits No. 3 and No. 4 are pictorial illustrations of his opinions. As such, and not as official records, they are admitted.

Defendant's objection #5. Mr. John R. Rand, a consulting geologist, was permitted over defendant's objections to express the opinion that "there is no deposit of high calcium limestone in the Rockland area which can compare in terms of tonnage or grade with the deposit in the Union belt north of the current operating quarry in Union."

Mr. Rand is an experienced professional geologist who served as the State Geologist from March 1, 1956 to July 1, 1959. He visited the Union Quarry and examined the exposed rock. He directed the drilling of six drill holes in the area, examined the cores taken from them and from the single hole drilled by the State. He studied the reports of the chemical analysis of these cores prepared by an assay company. Although he did not examine all the quarries in the Rockland area he personally visited the Cedar Street, Sleeper Field and Williams Field quarries and various other old abandoned quarries whose names he did not recall. He was generally familiar with some obvious geologic features of some other limestone deposits in the general area. In addition, he acquired other information from sources other than his own observations. He studied various private and public reports of other geologists concerning the area, including the Allen report and the Cheney report. As State Geologist he caused studies to be made of the limestone deposits in this area and reviewed them. Although he examined the rock structure in the Union Quarry, he did not personally analyze its samples and he is relying to some extent upon reports of the analysis of such samples given to him by Lime Products Corporation.

Early in Mr. Rand's direct examination he stated that he was to some extent relying upon information given to him by others concerning the assay reports plus what the Cheney report shows. Defendant's counsel objected to his conclusions on the ground that this information was hearsay. The objection was premature as no conclusion had been asked for or given at this point. However, the record shows that at a point some twenty-four pages later in Mr. Rand's testimony he was asked for such a conclusion and he gave the answer, the objection to which is now under consideration. The basis of defendant's counsel's objection was then stated to be his lack of detailed knowledge of Rockland deposits. M.R.C.P., Rule 46. No allegation as to hearsay was made at this point and we assume that this possible ground for objection had been abandoned by defendant.

■ Mr. Rand was well qualified by education and experience to express an opinion on the comparison of geological structures. The information he has acquired concerning the subject matter of the question when evaluated by him as a trained and experienced expert is sufficient to permit his opinion to be received. The trier of the fact must then determine its weight.

Defendant's objection #6. Mr. Rand testified that about 18 days before hearing, at counsel's request in an effort to arrive at a fair understanding of each other's positions, he and the State geologists met and exchanged geologic information concerning this issue on two occasions. He testified that they compared information and that he left his work maps, sheets and computations for their examination. Over

objection he was permitted to testify that the State's geologists never indicated to him that they were rejecting or questioning his estimates of quantity and quality until the day of hearing.

■ The doctrine of assenting silence is stated to be that to constitute admissible proof of an admission by a person's silence, a statement must have been made in the person's presence and hearing when the person was capable of understanding it, when the truth of the facts stated were within his own knowledge, when he was in such a situation that he was at liberty to make a reply and when the statement was made under such circumstances and by such persons as naturally to call for a reply if he did not intend to admit it. Thayer v. Usher, 98 Me. 468, 471, 57 A. 839, 840 (1904); Dennis v. Waterford Packing Company, 113 Me. 159, 162, 93 A. 58, 60 (1915); 29 Am.Jur.2d, Evidence, § 633; 31A C.J.S. Evidence § 294.

The reasoning behind this rule is explained by the opinion in Commonwealth v. Kenney, 12 Metc. 235, where the court explained that just as an oral admission is admissible against a party because he is presumed not to admit anything against his own interest unless compelled to do so by the force of truth, so may a failure to reply to a statement sometimes be considered an assent to it.

Here the silence was not that of a party but of geologists who were employed to assist defendant in evaluating its case.

■ The evidence does not convince us that the estimates and computations on his work maps and sheets were left by Mr. Rand with the defendant's geologists under such circumstances as naturally to call for a denial from them in their positions of employment after they had completed their examination if they did not admit the correctness of his figures. We give no weight to this part of Mr. Rand's testimony.

Defendant's objection # 7. Mr. Harold B. Kaler, who was at the time of taking president of the lessee, Lime Products Corporation (and later became president of plaintiff corporation, the lessor) was asked in direct examination how, on March 1, 1960, Lime Products Corporation intended to implement its rights as to the limestone reserves in question and he answered the question. The exhibits show us that on that date, a few weeks before the taking, the Lime Products Corporation, was given the right to remove the limestone from the property for a term of three years with an option of renewal for three years subject to the plaintiff's right to terminate the agreement if and when the Great Northern Paper Company returns to the use of limestone in its process. This indenture set forth Lime Products Corporation's rights in the reference parcel.

In Nichols, Law of Eminent Domain, 3rd Ed., Vol. 4, § 12.314, it is stated "Evidence may be adduced showing only the naturally adapted uses of the property in its present condition. The owner's actual plans or hopes for the future are completely irrelevant. Such matters are regarded as too remote and speculative to merit consideration."

■ The intentions of the persons holding office in the corporate lessee, affected as they might later be by countless personal, mining and market developments, are at least equally remote and speculative. The witness's answer will not be considered by us.

Defendant's objection #8. It is plaintiff's contention that the reference property is so unique and special that no comparable sales have occurred to assist us in evaluating it and that therefore the court may consider evidence of the present worth of future royalties and the present worth of future earnings. The defendants objected strenuously to this evidence and the referees admitted a great deal of testimony of this nature *de bene*.

In Curtis v. Maine State Highway Commission, 160 Me. 262, 203 A.2d 451 (1964) we discussed the meaning of the term "just compensation" and the techniques of measuring it and we again accepted as the standard of measurement of "just compensation" the difference between the fair market value of the whole property before the taking and the fair market value of what remained after the taking. We also affirmed the generally accepted rule that fair market value should be determined on the basis of its highest and best use at the time of the taking or in the reasonably foreseeable future but we made it clear that remote and speculative future developments may not be considered. We accept the often quoted rule that market value is the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses to which the land is adapted and might in reason be applied. Nichols, supra, § 12.2(1).

We recognize that there may be situations where the property, under its highest and best use, is so adapted to such a specialized purpose for its owner's particular benefit that its sale in a free and open market could not reasonably be assumed as such property is not commonly bought and sold. In such cases as church buildings, college buildings, cemeteries, etc., the courts have allowed market value to be determined by a reference to the intrinsic value of the property. Idaho-Western Ry. Co. v. Columbia Conference, 20 Idaho 568, 119 P. 60, 30 L.R.A.,N.S., 497 (1911); Newton Girl Scout Council v. Massachusetts Turnpike Authority, 335 Mass. 189, 138 N.E.2d 769 (1956); Assembly of God Church of Pawtucket, R.I. v. Vallone, 89 R.I. 1, 150 A.2d 11; 39 B.U.Law Review 615 (1959).

The plaintiff contends that its property is unique in that it is the only one which has such a large deposit of such high quality limestone so easily accessible and situated so near the market and that therefore there have been no comparable sales to support a market value test. If true, this is not the kind of uniqueness that has persuaded some courts to allow evidence of intrinsic value under the special use rule. This property has a market value for mining uses. It was bought for that purpose by one person, leased for that purpose by another and no doubt could be sold for that purpose to still another.

The plaintiff has failed to satisfy us that its property is of such a nature or so situated that its real value for actual use cannot be ascertained by reference to market value. Newton Girl Scout Council v. Massachusetts Turnpike Authority, supra.

The absence of comparable sales would not necessarily compel the Court to resort to proof of intrinsic value of property which is not of the "special use" type just discussed.

"If, however, there were no sales from which the general selling price might be ascertained, the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation. In such cases it is proper to adduce evidence upon all matters affecting probable selling price, such as location, condition, improvements, quality of land or coal, and any other element of value that would influence the mind of a purchaser." Philadelphia & Reading Coal & Iron Co. v. Commissioners of Northumberland County, 229 Pa. 460, 79 A. 109, 111 (1911); Sgarlat Estate v. Commonwealth, 398 Pa. 406, 158 A.2d 541, cert. denied, 364 U.S. 817, 81 S.Ct. 49, 5 L.Ed.2d 48 (1960).

There have been numerous sales of limestone bearing land in the area. They vary in acreage, in the quality and quantity of the minerals and in the problems of removal. None is identical with that of plaintiff but we cannot say that plaintiff's limestone reserves were beyond reasonable com-

parison with them. "Similar" does not mean identical, and properties may be sufficiently similar for the purpose of comparison although each may differ in some respect, such as in size, location and in quantity, quality and depth of the material. Sales of these properties may assist the knowledgeable expert, along with other factors bearing on value, in evaluating this property. Redfield v. Iowa State Highway Commission, 251 Iowa 332, 99 N.W.2d 413, 85 A.L.R.2d 96.

This case is somewhat unique in the sense that circumstances have made it necessary for us to measure the damage to plaintiff's interest in the minerals alone, but we do not feel that that fact requires us to depart from the accepted fair market value test. We see little practical distinction between the valuation of ownership of land which has little worth except for its mineral reserves and the valuation of the mineral reserves alone. The value of each is the value of the limestone and the problems of removal of the stone are essentially the same. The nature of open pit mining is such as to leave the surface largely destroyed when the operation is completed in either case. A person who is qualified to evaluate land the best use of which is for such mining limestone should be able by similar reasoning to arrive at a value of the minerals.

The overwhelming majority of the decisions concerned with valuation of minerals and mineral bearing lands reject as speculative attempts to prove value by capitalization of future earnings or a multiplication of estimated quantities of minerals in place by a unit price.

"In applying the valuation process to mineral deposits in place it has been held improper to determine the value thereof by using the product of the estimated amount of the deposit and a fixed price per unit. In the first place the estimate as to quantity has been considered too speculative and uncertain to merit consideration. In view of the contingencies and uncertainties of business in general, there can, in such case, be no certain estimate of the cost and potential profits." Nichols on Eminent Domain, supra, page 423.

See also Comstock v. Iowa State Highway Commission, supra; State by and through State Highway Comm. v. Arnold, supra.; New York Central R. Co. v. Maloney, 234 N.Y. 208, 137 N.E. 305 (1922); Nedrow v. Michigan-Wisconsin Pipe Line Co., 245 Iowa 763, 61 N.W.2d 687 (1953); Ringwood Co. v. North Jersey District Water Supply Commission, supra; State v. Mottman, Mercantile Co., 51 Wash.2d 722, 321 P.2d 912 (1958); Sgarlat Estate v. Commonwealth, supra; 27 Am.Jur.2d, Eminent Domain, supra; Lorin J. Broadbent, Eminent Domain Valuation of Land Containing Minerals, Utah Law Review, Vol. 6, No. 3, page 345.

The reasoning behind the almost uniform rejection of valuation based upon capitalization of profits or royalties and upon gross quantity of minerals *in situ* multiplied by a unit price is fully explained in the opinion of the court in United States ex rel. Tennessee Valley Authority v. Indian Creek Marble Co., D.C.Tenn. (1941), 40 F.Supp. 811:

"Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more de-

sirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value. True it is that quality and quantity have a place in the mind of the buyer and the seller, but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent."

In Nedrow v. Michigan-Wisconsin Pipe Line Co., supra, 61 N.W.2d at page 694, the court dramatized the dangers of determining damage by means of the capitalization of earnings by referring to Ranck v. City of Cedar Rapids, 134 Iowa 563, 111 N.W 1027 (1911), where the property taken housed a profitable livery stable business. There the court said:

" * * * Perhaps we can best illustrate the fallacy of his method of measuring damages by going back to the Ranck case where the livery stable owner was allowed to support the value estimates by showing his present income from the livery stable business. Suppose in that case, decided in 1907, instead of using the income to support value estimates, the court had decided the automobile that was then beginning to join the stream of traffic was only a passing fancy, and allowed the assessment of damages measured by the income the owner then received from his livery stable, projected on into the future on a capitalization plan. The application of such a foretelling measure of damages would look a little ridiculous a few years later."

The logic of the majority holdings may be appreciated when we compare the present case of limestone in place with the case of Smithrock Quarry, Inc. v. State, 60 Wash. 2d 387, 374 P.2d 168 (1962), where rock material which had been mined from its original location and was resting on the ground was taken by the State. The court viewed this rock material as a commodity and held that its value could be proved by multiplying the estimated quantity by a unit price. In Smithrock the quantity and quality of the rock was ascertainable and the uncertainties of mining difficulties, market changes and managerial problems no longer existed. In the reference case the limestone was still deep in the earth on March 30, 1960, its quality and quantity to be inferred and estimated only, with many years of uncertainties as to mining, management and financing problems and of possible market fluctuations or technical obsolescense remaining before its true value can be known. While the plaintiff, at the time of taking, had just leased to Lime Products Corporation the right to mine its limerock for three years (with an option to renew for another such term) at a royalty of fifteen cents a ton, this lease gave plaintiff no assurance of income beyond the day when Lime Products Corporation might find it economically infeasible to continue to operate.

It is necessary to bear in mind also that the owner is not entitled to recover the profits he might expect to receive from selling the minerals as units over a period of future years but instead what the entire property would sell for the day of the taking.

In Curtis we adopted the thinking of the great majority of the jurisdictions when we excluded as too remote and speculative testimony as to detailed estimated increased costs of bringing a water supply to a still undeveloped area, the highest and best potential use of which was for a dwelling house sub-division. Following the same reasoning, we here adopt the majority holding that the value of minerals in place can-

not be determined by multiplying estimated quantity times a fixed price per unit or by a capitalization of estimated income or royalties, and that an opinion based upon such processes alone must be rejected.

■ We realize the estimated quantity and quality of the mineral in the earth are important considerations to the purchaser and seller. So are the prices at which the products are being sold and the presence or absence of a demand for them. While, as we have said, a valuation based upon a multiplication of these elements is so speculative that it must be rejected, such facts themselves may be considered by the knowledgeable expert and by the court and jury, as may any advantageous or disadvantageous situations as to production or marketing, but "only as contributing factors to the ascertainment of market value rather than as the criterion thereof." See Footnote, 4 Nichols on Eminent Domain, 3rd Ed. § 13.22(2); Gulf Interstate Gas Company v. Garvin, Ky., 368 S.W.2d 309; State By and Through Road Comm. v. Noble, 6 Utah 2d 40, 305 P.2d 495 (1957); State v. Mottman Mercantile Co., supra.; 29A C.J.S. Eminent Domain § 136(7); United States v. Land in Dry Bed of Rosamond Lake, Cal., 143 F.Supp. 314 (D.C.1956). The expert witness may testify that his estimate of the fair market value took into account his appraisal of such advantages or disadvantages. But following our reasoning in *Curtis* we hold that except while being tested upon cross-examination he may not testify to estimated detailed costs of such uncertain procedures as extracting the mineral from the earth, processing and marketing it or of future profits from sales.

■ We must now examine the testimony of plaintiff's expert witnesses as to value in the light of this rule. The plaintiff presented R. Donald Stone, Appraisal Manager of a nationally known engineering corporation, and he visited the property, obtained from others information as to existing and potential markets, competition, quality and quantity of the product and the costs of quarrying. He concluded that the plaintiff could sell 65,000 tons of limestone annually over a period of 37 years before the reserves were exhausted. He accepted the fifteen cents royalty which plaintiff is now receiving as a justified figure. He then capitalized this amount concluding that the present value of these royalties over 37 years is worth $106,000. After studying present and past market prices he then chose an average price per ton of $4.25 for the product, computed the income which he estimated the owner would receive over a period of 37 years and after deducting estimated operating expense, depreciation, taxes, etc. he arrived at the present worth of income from the reserves at $585,000 from which he then deducted the cost of a proposed plant and certain working capital requirements leaving a present residual value of the reserves of $219,000. He then expressed his opinion that the fair market value of the property before the taking was $130,000. Although the question which brought forth this opinion was prefaced with the words "and considering all these factors", Mr. Stone's answer appears clearly to be his opinion of the price he thought the purchaser would pay and at which an owner would sell a property with capitalized royalties worth $106,000 and capitalized income of $219,000. Mr. Stone's assumption of an annual production and sale of 65,000 tons of limestone at a fixed price of $4.25 per ton for a period of 37 years at a stable profit during that time, or of a receipt of a fixed royalty on a fixed production during those years, is so speculative that it must be rejected. His opinion which was based upon this speculation must be rejected also.

■ Plaintiff's other value witness was Mr. Kaler the president of the plaintiff corporation, although he was not connected with plaintiff until two years after the taking when he and his associates purchased the corporation. Mr. Kaler was educated in Rockland and went to work for the Limestone Mining Company there following his high school education in 1936. Except

for his military service he worked in limestone production as sample boy, laboratory technician and in various managerial capacities in the Rockland area most of the time until 1958 when he worked as production engineer for three cement plants in New York and Maryland. He started pumping out the old quarry on the Clark property in December 1959 and has been engaged in limestone production in this same quarry ever since. He showed considerable familiarity with the limestone deposits of the area and of market conditions. After discussing the costs of operation, the market, the royalty paid at present by Lime Products Corporation, the past production of this deposit and its quality, he stated that in his opinion the value of the property just prior to the taking was $200,000. On being asked upon what factors he relied in arriving at that opinion he answered "As President of Knox Lime Company, and realizing that there was a market, and realizing that it was operable, and knowing the present royalty was fifteen cents a ton, and realizing further that there was two million ton in there, certainly this is a conservative value to place upon that deposit." He went on also to say he relied upon the overall market, transportation advantages and the fact that this deposit was the only proven deposit that could supply this particular market in Maine.

"An owner of real estate, * * * or an officer of a corporation, * * * must have knowledge of the real estate, apart from his ownership or mere holding of an office, which qualifies him to express an opinion as to its value." Newton Girl Scout Council v. Mass. Turnpike Authority, supra, 5 A.L.R. 1171; 45 A.L.R. 1494.

Although Mr. Kaler's status as present president of plaintiff corporation does not in itself qualify him to express an opinion, he demonstrated a sufficient familiarity with the property in question, its capacity to produce, the general market values in the vicinity and the values and capacities of competing quarries. Although he did not become plaintiff's president until 1962, he was operating the quarry as lessee at the time of the taking. His opinion is not based on any theory of capitalization and his use of the estimated units and of present royalty prices are only as factors going to form a basis of his opinion. His opinion is admitted.

Defendant's objection #9. Mr. Kaler was asked the reasonable royalty from a ton of calcium limestone from the Union Quarry. He answered fifteen cents a ton. He was qualified to answer. The answer is relevant as being one of the factors which would enter into the determination of fair market value. Mr. Kaler was then permitted to testify de bene that the fair royalty value for the magnesium limestone deposit at nearby Warren was ten cents. This was offered to prove an uniqueness on the part of the Union Quarry. Such evidence was relevant to the question of comparative quality of the minerals and we have considered it but, as we have just concluded, it does not prove the uniqueness which would justify resort to proof of intrinsic value.

■ Defendant's objection #10. We find that Mr. John M. Deeley, Jr., the operator of a limestone quarry in Lee, Massachusetts, did not show sufficient familiarity with the expenses of operations in Union to make relevant as comparable his testimony concerning operating costs in Lee, Massachusetts, or to express an opinion as to operating costs in Union or reasonable royalty rates there and in Warren. On the other hand, his operating experience qualified him to express an opinion, for what it is worth, that the reserves remaining have no value because each divided area is too small to quarry to the depth necessary to make an economically profitable operation.

■ Defendant's objection #11. During the hearing defendant's counsel objected several times to testimony as to occurrences since the date of taking which

reveal new facts relating to the value of the property. It might seem that facts concerning the value of the property here which were latent and could not have been known to the theoretical willing buyer and seller at the date of taking and so could not have influenced their judgment as to market value could not be relevant to the question of value now. However, this is not necessarily true as to subsequently acquired knowledge of pre-existing facts concerning the quantity and quality of the limestone deposits in the ground. When we assume the theoretical sale of limestone deposits between the willing buyer and seller, "taking into consideration all uses to which the land is adapted and might in reason be applied", we assume both parties are reasonably well informed as to the quantity and quality of the deposits they are buying and selling. We must assume that before they would buy and sell they would make sufficient test borings in representative areas to inform themselves reasonably. Therefore, we accept here as admissible evidence the testimony of witnesses as to knowledge of the true condition of the deposits which was later acquired through test borings, test pits and further exposure by recent mining operations.

We must now evaluate the legally admissible testimony, establish what damage has been done to plaintiff's mineral rights by the taking and determine the extent of reduction in the fair market value of plaintiff's property as a result of the taking.

The State took outright for the right of way for the new Route 17 a strip of land 100 feet wide extending across the Clark lot. This right of way taken comprised 1.6 acres and the minerals under this 1.6 acres were lost forever.

However, test borings made after the taking have demonstrated that the limestone situated under the right of way is the poorest quality commercially and the least valuable of that of any area in the deposit of which drillings or exposure have permitted actual analysis.

Furthermore, the plaintiff will not be able to mine up to the edge of this right of way because of the necessity of leaving an angle repose of soil between the right of way and the walls of the mine sufficient to support the right of way and to prevent land slides into the mine. Mr. Kaler felt that it would be necessary to leave unmined 100 feet on each side of the new Route 17. Mr. Wing, an economic geologist testifying for the State, concluded that while this strip would need to be 100 feet wide on the westerly side of Mr. Clark's lot, it could narrow progressively down to 20 feet on the easterly end as the amount of overburden becomes progressively shallow. The limestone of these two areas is also lost to the plaintiff.

The dangers of blasting near the road will also limit the approach of mining operations toward this highway on either side. We conclude that the limestone in a strip 100 feet wide on either side of the right of way will be unavailable to the plaintiff because of the necessity of angle repose and blasting dangers. We assume, of course, the traffic will have to be stopped at a safe distance back on Route 17 during the blasting at added expense to the operator of the mine.

It is clear that besides the loss outright of the minerals above mentioned, the taking of the right of way and the division of the plaintiff's reserves into two sections has substantially reduced the value of the reserves. Before the taking the plaintiff's minerals were situated in a strip of land some 1500 feet long and 250 feet wide at its greatest width. The new highway divides plaintiff's minerals into two sections, the south one being approximately 600 feet by 200 to 250 feet and containing 8.1 acres, and the north section containing 19.75 acres and being approximately the same width and considerably longer. Unquestionably the theoretical willing buyer and seller whose judgment determines the fair market value of property would conclude that the difficulties of mining the remaining two parcels have greatly increased after the taking. We cannot, however, accept the plaintiff's

contention that each parcel is no longer of any economic value. We find more convincing the testimony of defense witnesses that deposits of this size can be mined although at greater expense. Two entrances will be required instead of one and we have considered the cost of duplicated entrances and the double expense of removing worthless overburden to reach the area of deposits as a purchaser of the property would consider it. We also realize that such mines are opened by building ramps over rock left standing along the sides of the excavations aproaching the bottom at gradual grades interspaced with level safety areas. Considerable limestone must be left standing to support the ramps and is thus lost to production and avoidance of loss of valuable limestone is more difficult in reduced and divided areas.

In the south section the ramps must necessarily be constructed to a large extent on the limestone itself. In the larger northerly area it may be possible to locate the ramps in such a manner as to waste less limestone but there, according to present information, the deposit "thins out" and the proportion of limestone to overburden decreases making future operation of the north section less profitable.

The theoretical willing buyer and seller whose judgment would determine the fair market value of this property after the taking would be aware of the increased problems of production resulting from the taking as well as the estimated quantity and quality of the limestone lost and the selling price would reflect these results of the taking. We, too, have given consideration to the probable effects of these conditions upon the market value of the property. It is our conclusion that the taking by the State reduced the fair market value of the plaintiff's limestone reserves to the extent of $30,000.00.

The entry will be:

Judgment for the plaintiff in the sum of $30,000.00, together with interest on that amount from the date of the taking to the date of judgment at the rate of 6% to be computed by a Justice of the Superior Court.